Cali P. Madia, Esq.
Daniel S.  Szalkiewicz, Esq.
VERIDIAN LEGAL P.C.
23 WEST 73RD STREET
SUITE 102
NEW YORK, NEW YORK 10023
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUDREY BURNS, | **COMPLAINT** |
| Plaintiff, | |
| v. | Case Action No. 25-7474 |
| JAMES LIDESTRI, | |
| Defendant. | |

Plaintiff AUDREY BURNS ("Plaintiff" or "Audrey"), by her attorneys VERIDIAN

LEGAL P.C., as and for her Complaint hereby alleges, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      At fourteen years old, Audrey had already dealt with her share of hardship.  For a

time, she was homeless, hitch hiking from Oklahoma to California with her mother.  Shortly

after they returned to Oklahoma, Audrey's mother was struck by a semi-truck; she survived but

was seriously injured.  Though she was barely a teenager, Plaintiff was thrust into a caregiver

position.

2.      Eager to help her family financially, Audrey set her sights on becoming a model.

Unfortunately for Audrey, the task of even building a portfolio was far beyond her limited

means.  Eventually, to Audrey's delight, she was able to find a photographer on Facebook who

was willing to take her pictures free of charge.  Later, in a stroke of what seemed like even

1

greater luck, that photographer connected Audrey with defendant JAMES LIDESTRI ("Lidestri" or "Defendant").

3.    Lidestri owned and operated "TeenStarlet.com" – a subscription-based website filled with images of provocatively posed and scantily-clad underage girls and young women. Getting connected with Lidestri meant Audrey would no longer need to pay or rely on the generosity of photographers – it meant that *she* would be the one getting paid as a model.

4.    For Audrey, this was not just rent money, it was stability and control over her future.

5.    Unbeknownst to Audrey at the time, she had unwittingly interjected herself into a group of men who would gradually push and exceed her boundaries, promising at first just money to survive and later fame and fortune.  In her quest for independence, Audrey would be sexually exploited and raped by Defendant.

6.    As a child forced to act like adult to survive, Audrey grew to view this behavior as a normal part of her everyday life, unaware that the trauma and abuse she was enduring would haunt her for years.

7.    Plaintiff's life has been anything but easy, with Plaintiff's images going viral and making their way to her Oklahoma high school when she was just seventeen.  Shortly thereafter, Plaintiff dropped out of school, moved to Florida, and turned to the thing Lidestri had taught her would bring her some semblance of financial security: stripping.

8.    When, years later, Plaintiff was approached by a New York Times reporter about Lidestri, Audrey spoke her truth.  In response, Lidestri sued her.

9.      Not willing to be silenced by Lidestri's abusive litigation tactics, Burns now brings this action against Lidestri for his violations of 18 U.S.C. §§2252(A), 2255, 2251, 1595 and 1466(A).

## THE PARTIES

10.     Defendant Lidestri is a citizen of the County of Dutchess, State of New York. Lidestri's last known address is 24 Hillside Drive Poughkeepsie, NY 12603.

11.     Defendant Lidestri operated Teen Starlet out of his home in Hopewell Junction, NY; raped Plaintiff in his home in Hopewell Junction, NY; and initiated a lawsuit against Plaintiff in the United States District Court Southern District of New York.

12.     Plaintiff is a citizen of the United States and not a resident or citizen of the State of New York.

13.     Though Lidestri shut down his child pornography websites several years ago, he remains active in the technology sector.

14.     In January 2025, he launched "MoxieJam" an app which provides its users with custom choices for entertainment based on algorithms and their own selections.

15.     A press release for the new app describes Lidestri as a "renowned technology executive and pioneer in the SaaS industry" and states that he has "consistently demonstrated a knack for identifying market needs and delivering innovative solutions."

16.     SaaS stands for "Software as a Service" and is a delivery model where providers host and manage applications which are available to internet users, typically by subscription.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to 28 U.S.C. § 1332(a)(1) based upon Diversity of Citizenship because the amount in controversy exceeds the sum or value of $75,000.00,

exclusive of interest and costs, and it is between a citizen of New York and citizens or subjects of a different state.

18.    This action is also brought pursuant to 28 U.S.C. § 1331, federal question, pursuant to 18 U.S.C. § 2251 and 18 U.S.C. § 2252.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this is the Judicial District in which Defendant resides.

## FACTUAL ALLEGATIONS

**Plaintiff's Quest to Become a Model**

20.    Audrey was born in Durant, Oklahoma on July 1, 1996.  She was raised in a Pentecostal Christian household prior to leaving to live with her mother as a teenager.

21.    When Audrey was fourteen years old, her mother was seriously injured when she was struck by a semi-truck.  Though the family had previously been homeless, they found housing in Oklahoma following the accident.

22.    By this time, Audrey was wise enough to appreciate the tenuousness of their living situation and endeavored to earn money for her family and herself.  Too young to leave school, Audrey identified modeling as a path to explore as it did not require long hours and had the potential to be lucrative.

23.    Audrey soon realized there was a financial component to modeling which would serve as a barrier to her entry: a portfolio.  More specifically, before people would pay her to model for them, she would need a cache of professionally taken photographs of herself demonstrating why she should be selected.  As photographers typically charge money for such photoshoots, Audrey feared her quest to become a model was over before it even began.

24.     Thankfully, Audrey found a photographer who was willing to photograph her free of charge. The photographer, Jim, informed Audrey that he, too, was aiming to build a portfolio.

25.     Audrey enjoyed herself at the photoshoot; she brought and wore her own clothing, posed in an age-appropriate manner, and felt safe. Both Audrey and Jim were pleased with the resulting photographs, sharing them on their respective Facebook pages.

26.     Within days, Jim from Castle Rock was contacting Audrey to inform her that another photographer – "Jim Giacomo" – had seen her photographs and wanted to work with her.

27.     Audrey would later come to learn "Jim Giacomo" was an alias used by Defendant James Lidestri.

28.     Upon information and belief, Jim from Castle Rock relayed to Lidestri that Audrey had attended the photoshoot without parental supervision, communicated with him without a parent, and came from a financially unstable household.

**Audrey's First Paid Photoshoot**

29.     Audrey was informed that she would be getting paid for her "test shoot" for Lidestri but that she would need to travel two and a half hours to Dallas, Texas for the shoot.

30.     With her mother still in recovery, Audrey recruited her sister and her boyfriend to drop her off at Jim's studio and pick her up a few hours later. Audrey agreed that she would pay for gas with the money she received from the shoot. At sixteen, Audrey's sister was older, but not by much.

31.     Like with the first photoshoot, Audrey arrived with a small selection of her favorite clothing which she believed was flattering and would photograph nicely.

32.    To Audrey's surprise, the photoshoot began outdoors.  Additionally, while the first set of photographs had included both classic and playful poses, the positions Jim was directing her into for these pictures was decidedly different.

33.    At one point Audrey was told to get on her hands and knees as she was photographed from all angles; at another point, she was made to put her hands on the ground while she raised her buttocks and was photographed from behind.

34.    Audrey was initially uneasy with the pose requests but took comfort in the fact the shoot was occurring outdoors.

35.    Audrey was fourteen and it was her second ever photoshoot and the first time she was ever being paid to have photographs taken.  She did not want to be perceived as uncooperative or labeled difficult to work with.

36.    When Jim told her the next shoot would take place inside his studio, Audrey went along.  Inside, Jim provided Audrey with a selection of clothing, informing her Lidestri wanted her to wear it.  The selection included an oversized men's t shirt, a white button-down shirt, and a green g-string bikini.  She was directed to wear heels.

37.    Once dressed, Audrey was placed in front of a bare wall and directed into the same provocative poses she had done outside.  During this portion of the photoshoot, Audrey was also made to pose topless with her hands covering her breasts.

38.    Jim's refrain throughout the photoshoot was that Lidestri was going to love the photographs.  Though Audrey felt uncomfortable, she also viewed this as her opportunity to be discovered and did not want to do anything that would make her seem immature, difficult, or otherwise discourage Lidestri from hiring her again.

39.     For these men, Audrey was the perfect package: young, beautiful, eager to please, minimally supervised, and financially desperate.

**Lidestri Opens Communication with Audrey**

40.     Once Lidestri received the more provocative photographs and, upon information and belief, received information about how the photoshoot went and who was present, he began contacting Audrey directly.

41.     Lidestri told Audrey how much he enjoyed the photographs from her last session and indicated an interest in photographing her himself.  Unfortunately, he indicated, she would not be able to shoot with him in New York until she was fifteen and a half and – even then – those photographs could not be released until she was sixteen.

42.     Audrey was very aware that her family needed income to pay rent and other bills and those payments were not going to wait until she turned sixteen.  Audrey explained her family's difficult financial position and inquired about ways she could continue modeling for him.

43.     Lidestri seized on the moment, suggesting that he would send Audrey money through Western Union if she sent him pictures.  The direction she received was that she should, in sum and substance, "keep being sexy" in the pictures.

44.     Audrey acquiesced with little hesitation.  She first sent him a photograph wearing shorts and a t-shirt that allowed both her underwear and bra to show.  While she believed she was "being sexy," Lidestri was less than impressed.  He directed Audrey to take off more clothing, which she did.

45.     While Lidestri asked her to send naked photographs of herself, Audrey declined, stating she was not comfortable doing so.

46.     Audrey sent the photographs and Lidestri sent her money via Western Union, as agreed. This pattern continued for years.

**Audrey's Third Photoshoot**

47.     Several months after the second photoshoot, Lidestri arranged for Jim to photograph Audrey a third time.

48.     Realizing how much of her first payment had gone toward gas, Audrey asked to be reimbursed for travel expenses. Ultimately it was decided that Jim would make the trip to Oklahoma.

49.     Jim and Audrey met in Durant, Oklahoma in late winter or early spring.

50.     The first portion of the photoshoot took place near a lake. Like before, Jim provided Audrey with a selection of clothing she was to wear for the photoshoot. Again, Audrey was directed to pose on all fours or with her buttocks in the air while he photographed her from all angles.

51.     Next, Jim and Audrey went to a peanut factory then walked to a nearby abandoned mill. There, Jim provided her with cut-off shorts which barely covered Audrey's genitals as well as a white t-shirt. Audrey was directed to take off the top while keeping her nipples covered as Jim photographed her.

52.     By this time, Audrey was almost fifteen and a half – the magic age Lidestri had provided whereby she would be legally old enough to be photographed by him in New York. She began asking to schedule the trip, but Lidestri was avoiding it.

53.     For months, Audrey continued to message with Lidestri one-on-one and was still sending him the "sexy" photographs he was requesting – albeit not as "sexy" as he wanted.

Before long, however, Audrey was sixteen and Lidestri had still not booked her that promised trip to New York.

54.     Audrey worried Lidestri was going to go back on his promise to fly her to New York.

55.     Audrey began to withdraw from her communications with Lidestri, making herself less available and sending fewer and less provocative images.

56.     Lidestri began asking her if her body type had changed, whether she had any bruises, and whether she had put on any weight or gotten bigger.  He told her that if she wanted to model for him then she was not allowed to change her hair, get piercings or tattoos, or gain weight.

57.     This charade continued each time Audrey withdrew from the relationship or seemed unenthusiastic about sending photographs, with Audrey needing to prove her appearance and worth to get back into Lidestri's good graces each time.

58.     Despite his implicit threats, Lidestri consistently assured Audrey that she was his "favorite" and he was going to "take [her] places."

59.     As her appearance never substantially changed, Audrey now suspects Lidestri's resistance was related to him learning her mother was not going to allow her to go to New York without her.

60.     At Lidestri's request, Audrey asked her mother if her sister could accompany her instead, but Audrey's mother was insistent that she make the trip, no matter how physically taxing it would be for her.

**Audrey's All-Expense Paid Trip to NYC**

61.     In April of 2013, Audrey and her mother flew business class from Oklahoma to New York, where they stayed at a hotel in Times Square. Both the tickets and the hotel were paid for directly by Lidestri and, prior to the trip, Lidestri sent Audrey a Western Union payment for travel incidentals such as taxis and food.

62.     Lidestri also asked Audrey what her mother liked to eat and drink, indicating that he would be sure to purchase it in advance of the photoshoot.

63.     When Audrey and her mother got to their room, they found at least ten $100 bills lined up on the bed alongside a bag from Juicy Couture.

64.     As a sixteen-year-old from Oklahoma who had been homeless just a couple years earlier, Audrey was beside herself.

65.     Lidestri picked up Audrey and her mom and drove them around Manhattan. They drove past the Statue of Liberty and then to the National Museum of the American Indian, which was closed.

66.     Ultimately, the trio walked around Times Square, visiting the M&M Factory and a few other stores and tourist traps. At the end of the evening, Lidestri dropped Audrey and her mom off at the hotel, warning Audrey not to eat anything prior to the photoshoot. He told Audrey and her mom he would be back the next day to pick them up.

67.     It was at this point that Audrey began to appreciate that the photoshoot would be taking place at Lidestri's home.

**Lidestri's Upstate Photoshoot: Day One**

68.     Lidestri arrived at the hotel as planned, picking up Audrey and her mom for the long trek back to his house.

69.     Audrey recalls being nervous and growing increasingly uncomfortable during the long drive.  She was simultaneously nervous about what was about to happen, but also that her mom would "find out" and put an end to her modeling career.

70.     Audrey was immediately impressed with the size of Lidestri's home and in awe of the pink cherry blossoms which surrounded his long driveway.  The interiors were modern and well-kept.  Being in the home only supported Lidestri's representations that he was a successful photographer.

71.     Audrey began to hope that, one day, perhaps she could afford to live in a home this nice.

72.     Meanwhile, Lidestri was rolling out the red carpet for Audrey's mom, offering her favorite food and beverages.  His tour of the house ended with him dropping off Audrey's mom in his in-home theatre.  Lidestri showed her the fridge, which was stocked with Michelob Ultra – her favorite – and told her to get comfortable and order herself anything she wanted to watch.

73.     Audrey's mom, still heavily medicated from the accident and exhausted from traveling and walking the day before, plopped down into a chair and did just that.

74.     Once Audrey's mom had been deposited in the basement, Lidestri took Audrey back upstairs to his kitchen table.  There, he showed Audrey pictures of swimsuit and Playboy models he indicated were to serve as inspiration for the photoshoot.

75.     Lidestri told Audrey that the inspiration photos were all part of his and Jim from Castle Rock's portfolios – images he and Jim had captured of women they had made famous.

76.     The models were wearing the same type of g-strings she had been made to wear in previous shoots.  The photographs were not raunchy and the women were not naked.  In fact, even though the women were in bathing suits, they looked classy and beautiful.

77.    Audrey relaxed.  If these were the types of photographs Lidestri was going to take, her fear was unwarranted.  Audrey's excitement again grew.

78.    It was at this point Lidestri mentioned that she would be compensated by the day, meaning if she returned to his home the following day she would be paid additional money.

79.    The day before, Audrey had woken up in Oklahoma and flown business class to New York.  That night she slept in a hotel in Times Square and she was now sitting in a big house with a professional photographer who was promising to make her famous.  Audrey believed this was her moment.

80.    Audrey showed Lidestri her favorite top she had selected for the shoot and Lidestri said he would provide the bottoms.  Everything he had, he indicated, was new or had been washed.  The shirt Audrey had chosen had an open back and, when they were testing the light, Lidestri directed her to turn it around so the slit was in the front.

81.    With her shirt on backward, the only thing preventing her breasts from being exposed was her hands.

82.    Next, Lidestri provided Audrey her with black g-string underwear, offering to turn around if it made Audrey more comfortable.  Audrey said it would, and he obliged.

83.    The plan was for Lidestri to talk her through the photoshoot while he photographed the interaction and then they would repeat the poses while Lidestri videotaped her. The strategy was to make it seem like there was "behind the scenes" footage when, in reality, there was just one photographer and they were reenacting prior poses.

84.    From there, Lidestri coached Audrey through what he called "slips" which involved Audrey playing with her top and pretending to fumble her grasp so as to partially expose her nipple.

12

85.    As Lidestri photographed and filmed Audrey, he constantly groaned to himself and grabbed at his groin.

86.    When Audrey's "slips" were not to his liking, Lidestri brought her a Michelob Ultra.

87.    Audrey drank the beer quickly, growing relaxed and more amenable to Lidestri's direction.  Once the photographing was done, Audrey recreated the same poses while Lidestri videotaped her.

88.    Next, Lidestri put her in an "I Love NY" shirt which she had purchased the day before.  To Audrey's surprise, Lidestri had cut it up to make it more revealing.  Lidestri coached Audrey through more "slips" as he photographed, then they again recreated the poses as he filmed.

89.    After her "I Love NY" photoshoot, Lidestri brought her another beer and then the two went to a bedroom.  Lidestri brought out a new camera and told her to lay on the bed and relax.

90.    First, Lidestri told Audrey he was going to make her feel calm.  Next, he asked if she had been with a man before.  Audrey told Lidestri that she had once kissed a boy in the fourth or fifth grade, but her father had learned about it and freaked out.

91.    By this point, Lidestri was already on top of Audrey, weighing down the lower part of her small body with his.  He then performed oral sex on Audrey while she laid there silently with her fists and jaw clenched.

92.    When Lidestri decided he was done, he stood up, turned off his camera, and provided her with a wad of $100 bills.

93.     Lidestri warned Audrey not to tell anyone about what had just happened, explaining they could both get in trouble for the past photoshoots.  He provided Audrey with a white outfit and the two did another photoshoot in his bed.

94.     By this point Audrey was shutting down and having difficulty following directions.  Lidestri told Audrey to take a break so she grabbed some food and went down to see her mom, who she found passed out in the theatre.

95.     Lidestri and Audrey shot in one other room that day – this time in a different bedroom.  With Audrey still struggling, Lidestri ended the shoot.

96.     Lidestri was filled with excitement on the car ride back to Manhattan, regaling Audrey's mom with how talented Audrey was, how famous she was going to become, and the need to pick a fake name so men would not try to find her.

97.     Audrey was hungry, upset with what had just happened, and angry with her mother.  She was quiet for the majority of the trip to the hotel.

**Lidestri's Upstate Photoshoot: Day Two**

98.     Audrey woke up determined to get the photoshoot over with and make money.

99.     Unlike the day before, Audrey's mom was present and walking around the house.

100.     Like the first day, Lidestri made audible groaning noises as he photographed and filmed Audrey and constantly adjusted himself.

101.     During their a session, Audrey's mom called up the stairs to see whether they were done and, without even finishing the shoot, Lidestri said, in sum and substance, "let's go, you're done."

102.     Audrey attributed the short duration of the shoot to her mother's presence around the house and felt angry her mother had passed out the day before.

103.    Lidestri and Audrey met up with Audrey's mom at the kitchen table, stating this was the "fun part" where Audrey's mom needed to sign Audrey's contracts and they would pick out a name for Audrey.

104.    Audrey's mom signed the contracts on the spot and the group decided that, moving forward, Audrey would be known as "Kris Karson."

105.    Audrey's mom asked to see examples of the photographs he had taken, but Lidestri assured her that they first needed to be edited and he would show them to her before they were used.

106.    Lidestri returned Audrey and her mom to their hotel and they flew home the following morning.

107.    Lidestri purchased the domain name "KrisKarson.com" within one month of Audrey's New York trip.

## Audrey a/k/a Kris Karson Gains a Following

108.    Before long, Lidestri began telling Audrey that he had posted her content online and fans were loving her pictures.

109.    Lidestri even sent Audrey an Android on which she could interact with her fans.

110.    Realizing she was finally in a position of power, Audrey also asked for Lidestri to pay for her personal phone; Lidestri agreed.

111.    Still a teenager attending high school, Audrey was not always prompt to engage with her fans.  When Lidestri learned this, he began to threaten Audrey that if she did not do her job, she would be in breach of contract and would owe him $250,000.  Lidestri warned that he knew Audrey did not have the money so she had better start holding up her side of the deal.

112.    Thereafter, Audrey endeavored to spend at least thirty minutes of every day responding to vulgar and disgusting things sent to her by perverted internet trolls.  When Audrey did not understand what they were saying, she would thank them or send emojis.

113.    This went on for more than a year, with Audrey even skipping prom to be part of another photoshoot which Lidestri had arranged with a different photographer.

**Florida Photoshoot**

114.    When Audrey turned 17, Lidestri invited her to a photoshoot in Florida, which Audrey agreed to do only if another person was present.

115.    Audrey and the other model arrived before Lidestri and took the opportunity to compare their experiences with Lidestri.  They made a pact with one another never to leave one another alone in a room with Lidestri.

116.    Though Lidestri carried on grunting and groaning as he typically did, the photoshoot occurred without incident until the other model requested permission to get a tattoo.

117.    Lidestri told the other model "no," explaining that the more tattoos she got, the less childlike she would appear. Eventually, he told the model that he would agree to it only if she and Audrey allowed him to photograph them both naked.

118.    The model begged Audrey and, feeling like she owed it to the other girl for remaining true to their pact, Audrey eventually agreed.  At Lidestri's urging, Audrey and the other model pretended to kiss one another as Lidestri photographed them naked.

119.    With two months left in her Junior year of high school, Audrey's images went viral as she was dubbed one of the "10 Best Asses" on Vine.  The video quickly spread throughout school where she was relentlessly mocked and bullied her for being "Kris Karson."

120.    Even Audrey's uncle found out about it and decided to take it as an invitation to walk in on her when she was showering.

121.    At 17, Audrey saved her money and moved to Florida, where she lived in her car until she made enough money stripping to rent a room from a co-worker.

**Lidestri Reopens Communication**

122.    After Audrey turned 18, Lidestri reached out to her and told her it was time for her own website.

123.    Lidestri said that he had been keeping track of Audrey through social media, saw that she was taking care of herself, and said that this was an opportunity for her.

124.    Audrey agreed, warning Lidestri that she would no longer work for pennies, that she now understood how much he was making off of her, that she was no longer afraid of her mom finding out, and that she now knew her worth.

125.    Once Audrey turned 18, Lidestri photographed her on one occasion.  Shortly thereafter, realizing no amount of money was worth seeing Lidestri again, Audrey cut off communications.

**Audrey's Struggles Post-Lidestri**

126.    Meeting Lidestri forever shaped Audrey's life.

127.    Though Audrey was already on a difficult trajectory after her mother's accident, Lidestri's influence made certain she would never experience the ease or joys of childhood.

128.    Lidestri targeted and preyed on Audrey due to her family's financial hardships, exploiting Audrey because he knew she was unsupervised, naïve, and desperate.

129.    Because of Lidestri, Audrey's first experience with sexual intimacy was being pinned down by a middle-aged man performing oral sex on her against her will.

130.    Because of Lidestri, Audrey would not attend prom, would not graduate high school, and would begin stripping to survive before she even turned 18.

131.    To this day, Audrey continues to experience intimacy issues because of what Lidestri did to her.

132.    Audrey has further experienced an uphill battle with substance abuse.

133.    While Audrey would prefer to work in a professional setting, she is also keenly aware that she continues to have throngs of fans who are willing to compensate her for her intimate images and videos.

134.    As a result, even though Audrey does work a "normal" job, she also frequently falls back on OnlyFans-type work when her financial circumstances require it.

135.    To this day, Audrey is still contacted by men who remember her and possess images and videos of her as a minor and who implore her to send them unreleased content from when she was a child.

136.    At least two of these men have informed Audrey that they purchased and possess the video of Lidestri performing oral sex on her when she was a child.

137.    Audrey is at once reliant on and resentful of her status as a child sex symbol. While she desperately dreams of a life where she had never met Lidestri, she also recognizes her notoriety provides her with the ability to earn money when times are difficult.

138.    Though Audrey knows her hardships are largely attributable to the exploitation she endured early in life, it is the only life she has ever known.

**Audrey Speaks, Lidestri Sues**

139.    In late 2024, Audrey was contacted by a New York Times reporter.

140.    The reporter was in the process of writing a series about underage female social media influencers and had been provided with Audrey's name by a fellow Teen Starlet model who Lidestri had exploited.

141.    In one article which was published on November 10, 2024, the New York Times wrote that they had contacted Lidestri for comment about his website and Lidestri "said that he was a tech entrepreneur, no longer in the photography business, and had provided information to law enforcement about 'people who weren't playing by the rules.'"

142.    The article went on to state that one child influencer featured on one of Lidestri's websites was earning tens of thousands of dollars monthly before Lidestri shut down the site in 2022, first offering to sell the business to the girl.  Rather than buy the business, the sixteen-year-old girl created her own website.

143.    Another piece from the series, this one published on December 30, 2024, was entitled "The Men Who Use Instagram to Groom Child Influencers[.]"

144.    The article (annexed hereto as Exhibit "") focused heavily on Lidestri, including one woman's report that, at seventeen, he bought her a "sex toy and offered her money for a video of her using it[.]"

145.    Multiple other victims of Lidestri came forward with stories similar to Audrey's, though Audrey was the only one who admitted to being sexually assaulted by him.

146.    Miraculously, some of the women still possessed their text message exchanges with Lidestri, with one woman showing messages which included dozens of requests for graphic

videos, despite the minor asking to stop, followed by "You don't want to make a few hundred dollars?" and "What are your alternatives?"

147.    Despite allegations of sexual impropriety or exploitation by all the women interviewed about Lidestri, Audrey is the only one he has chosen to sue for speaking out about the trauma she endured.

**Lidestri's Child Sex Abuse Material Empire**

148.    Lidestri purchased the domain name www.TeenStarlet.com on or about January 22, 2010.

149.    Upon information and belief, Lidestri owned and operated the membership-based websites on which he both sold images and videos of teenage girls and also sought photographers throughout the country and beyond.

150.    Upon information and belief the photographers would then work with Lidestri to locate and acquire "talent" – young girls who they would photograph and record and then present to Lidestri for his approval.

151.    Upon information and belief, once Lidestri had approved the girls, they would then be photographed and recorded by various photographers, including Lidestri himself. Sometimes, like with Audrey, Lidestri would fly the girls to other states to be photographed and recorded.

152.    Upon information and belief, the trips were presented as incentives to the girls to encourage them to interact with their fans, remain fit, and, most importantly, produce more and more content for the sites.

153.    Over the years, no fewer than 79 teenage girls appeared on Lidestri's Teen Starlet website.

154.    While Audrey does not recall how many sets she took with Lidestri and his other photographers prior to turning 18, evidence of Lidestri's uploads remains available online.  At a minimum, Lidestri uploaded the following "sets" depicting Audrey in various states of undress while she was a minor; each set contained multiple images of Audrey and typically was accompanied by a video showing "behind the scenes" content including Audrey's genitals and breasts:

a)  Amazeballs
b)  A Little Patience
c)  A Real Stunner
d)  Bad Reputation
e)  Banded in Black
f)  Bikini Session
g)  Black Tie Event
h)  Black Widow
i)  Brace Yourself
j)  Bubble Bath
k)  Clean Sheets
l)  Come on Up
m) Crouching Tigress
n)  Down n Dirty
o)  Dream Come True
p)  Dreams Are Made Of
q)  Dress Code Violations
r)  Dusting Off
s)  Feeling Blue
t)  Fill My Eyes
u)  Finally Here
v)  Flight Pattern
w)  Flight of Fancy
x)  Garters Bows
y)  Getting Wet
z)  Gift for You
aa) Go Os
bb) Going Clubbing
cc) Grab a Chair
dd) Hello

ee) Hello Pasties
ff) Hugging the Curves
gg) I Love NY
hh) In the Air
ii)  Jingle Bells
jj)  Just a Button
kk) Little Devil
ll)  Lounge Around
mm)        Magnificent Lace
nn) Morning Memory
oo) My Lollipop
pp) My Apology
qq) My Booty
rr)  My Jeans
ss) Night Vision
tt)  Orange Pee
uu) Orange You Glad
vv) Overhead
ww)        Party in the Back
xx) Passion Fruit
yy) Patiently Waiting
zz) Babydoll
aaa)        Plunging Neckline
bbb)        Pumping Iron
ccc)        Quick Change
ddd)        Ready Made
eee)        Red Heat
fff) Red Wedding
ggg)        Ripped in Pink
hhh)        Rise and Shine

iii) Rusted Shorts
jjj) Seeing Red
kkk)    Served Up
lll) Sleepy Time
mmm)    Soft Edges
nnn)    Southern Belle
ooo)    Sparkling
ppp)    Split Decision
qqq)    Step on Up
rrr) Summer Dress
sss)    Splendid Belief
ttt) Sweet as Honey
uuu)    Sweet Dreams
vvv)    Through the Net
www)    Time to Unwind
xxx)    Too Cute
yyy)    What Gown
zzz)    White Queen
aaaa)    Wrapped in Stripes
bbbb)    Yoga Anyone
cccc)    Yoga Pans
dddd)    Zigzag

155.    Photographs and/or videos of Audrey as a minor hosted by Lidestri and sold on his sites depicted Audrey engaging in actual or simulated masturbation, actual or simulated sexual intercourse, and lascivious exhibition of the anus, genitals, or pubic area.

156.    Some of the content was captured by other photographers and some of the content was captured by Lidestri, however all of it was published on his websites and sold by him through his membership-based websites.

157.    Lidestri purchased the domain name www.SelectSets.com on or about February 1, 2011.

158.    Lidestri purchased www.Honey-Cream.com on or about February 12, 2013. Honey Cream was designed to host images of Lidestri's older girls and on July 25, 2013 was advertising that it was in search of "18-21 year old female models."

159.    Upon information and belief, once the Teen Starlet girls turned 18, Lidestri would begin to post their content on Honey Cream and Select Sets, regardless of when the photos and videos were captured and/or whether they contained sexually explicit conduct.

2

160.    As his teen models grew in popularity, Lidestri also created websites using their stage names.  Audrey's website – www.KrisKarson.com – was purchased shortly after her New York photoshoot.

161.    Other websites purchased by Lidestri in the names of other teen models included Kelsey-Monroe.com, GeenaMullins.com, BrookeandBrandi.com, BrandiBlair.com, AlexArabella.com, ShayAdams.com, AmandaVerona.com, MiaVesela.com, SofiNovak.com, AylaRoss.com, LucieLaska.com, DanniDawn.com, PetraPetacova.com, SheriBelle.com, MayaLayne.com, TeenKelsey.com, MelissaManzoni.com, ChastityVal.com, and CaliSkye.com.

162.    Lidestri also owned and operated websites such as TeenStarletEuro.com, TeenStarletLatinas.com.

163.    Lidestri's collection of child sex abuse material ("CSAM") was prolific.  Though Lidestri appears to have removed his known websites, former members have republished portions of photoshoots throughout the internet en masse.

164.    The majority of the images still contain Lidestri's logos.

### FIRST CAUSE OF ACTION
### (Violation of 18 U.S.C. §2252(A), 2255)

165.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

166.    Plaintiff was 14 years of age at the time Defendant Lidestri first began soliciting intimate photographs and videos of Plaintiff both from Plaintiff directly and through his intermediary, Jim.

167.    Plaintiff was 16 years of age when she was sexually assaulted at James Lidestri's house as Lidestri filmed it.

168.    Plaintiff was 17 years of age when Lidestri photographed her naked and pretending to kiss and engage in sexual intercourse with another minor girl.

169.    Upon information and belief, the images and videos captured by Jim were sent to Lidestri electronically.

170.    Upon information and belief, the videos and images captured by Lidestri were disseminated to third parties and/or shared on his many websites.

171.    The photographs and videos of Plaintiff show sexually explicit conduct in that they show the lascivious exhibition of Plaintiff's anus, genitals, or pubic area and/or show lascivious simulated sexual intercourse where Plaintiff's genitals, breast, or pubic area was exhibited and/or constitute sexual intercourse, specifically oral-genital intercourse.

172.    The content was captured when Plaintiff was between 14 and 17 years old.

173.    Pursuant to 18 U.S.C. § 2255, "[t]here shall be no time limit for the filing of a complaint commencing an action under this section."

174.    Plaintiffs demand judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**SECOND CAUSE OF ACTION**
**(Violation of 18 U.S.C. §1466A)**

175.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

3

176.    Lidestri knowingly produced, distributed, received, and possessed with intent to distribute visual depictions of Plaintiff engaging in obscene sexually explicit conduct when she was a minor.

177.    The visual depictions contained imagery of Plaintiff, as a minor, engaging in oral-genital sexual intercourse with Lidestri and of imagery of Plaintiff appearing to engage in sexual intercourse with another minor female model.

178.    The visual depictions lack serious literary artistic, political, or scientific value.

179.    The visual depictions were communicated via e-mail using computers and/or cell phones, which are instrumentalities of interstate or foreign commerce.

180.    As a result of Defendant's conduct, Plaintiff was harmed.

181.    Plaintiffs demand judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**THIRD CAUSE OF ACTION**
**(Violation of the Mann Act, 18 U.S.C. §§2422, 2255)**

182.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

183.    At all relevant times, Plaintiff was a minor under the age of eighteen.

184.    Defendant knowingly used facilities of interstate and foreign commerce, including the internet, email, and telephone, to persuade, induce, entice, and coerce Plaintiff to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b).

185.    Defendant also arranged for and caused Plaintiff to travel in interstate commerce for the purpose of engaging in sexual activity for which Defendant could be charged with a criminal offense, in violation of 18 U.S.C. § 2422(a).

186.    Defendant's conduct constitutes a violation of 18 U.S.C. § 2422, one of the predicate offenses for which Congress has expressly created a civil remedy under 18 U.S.C. § 2255.

187.    Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, and/or maintained Plaintiff for the purpose of causing her to engage in one or more commercial sex acts, within the meaning of 18 U.S.C. § 1591(e)(3).

188.    As a result of Defendant's conduct, Plaintiff was harmed.

189.    Plaintiff demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## FOURTH CAUSE OF ACTION
### (Violation of the Mann Act, 18 U.S.C. §§2423, 2255)

190.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

191.    At all relevant times, Plaintiff was a minor under the age of eighteen.

192.    Defendant knowingly transported Plaintiff interstate with the intent that Plaintiff engaged in sexual activity for which any person can be charged with a criminal offense.

193.    Defendant also traveled interstate with the intent to engage in any illicit sexual conduct with Plaintiff.

194.    As a result of Defendant's conduct, Plaintiff was harmed.

195.    Plaintiff demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.    An award of damages against Defendant in an amount to be determined at trial, but not less than $150,000.00 per image and video shared, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

B.    An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

C.    Prejudgment interest on all amounts due;

D.      An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

E.      Such other and further relief as the Court may deem just and proper.

Dated: New York, New York

September 9, 2025

Respectfully submitted,

**Veridian Legal P.C.**

 _/s/ Cali P. Madia_____
By:     Cali P. Madia, Esq.
        Daniel S. Szalkiewicz, Esq.
23 West 73rd Street, Suite 102
New York, NY 10023
Telephone: (212) 706-1007
Facsimile: (646) 849-0033
cali@veridianlegal.com
daniel@veridianlegal.com

*Attorneys for Plaintiff*

7