Cali P. Madia, Esq.
Daniel S. Szalkiewicz, Esq.
VERIDIAN LEGAL P.C.
23 WEST 73RD STREET
SUITE 102
NEW YORK, NEW YORK 10023
*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUDREY BURNS,<br><br>        Plaintiff,<br><br>   v.<br><br>JAMES LIDESTRI,<br><br>        Defendant. | **COMPLAINT**<br><br>Case Action No. 25-7474 |

Plaintiff AUDREY BURNS ("Plaintiff" or "Audrey"), by her attorneys VERIDIAN LEGAL P.C., as and for her Complaint hereby alleges, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.     At fourteen years old, Audrey had already dealt with her share of hardship. For a time, she was homeless, hitch hiking from Oklahoma to California with her mother. Shortly after they returned to Oklahoma, Audrey's mother was struck by a semi-truck; she survived but was seriously injured. Though she was barely a teenager, Plaintiff was thrust into a caregiver position.

2.     Eager to help her family financially, Audrey set her sights on becoming a model. Unfortunately for Audrey, the task of even building a portfolio was far beyond her limited means. Eventually, to Audrey's delight, she was able to find a photographer on Facebook who was willing to take her pictures free of charge. Later, in a stroke of what seemed like even

1

greater luck, that photographer connected Audrey with defendant JAMES LIDESTRI ("Lidestri" or "Defendant").

3.      Lidestri owned and operated "TeenStarlet.com" – a subscription-based website filled with images of provocatively posed and scantily-clad underage girls and young women. Getting connected with Lidestri meant Audrey would no longer need to pay or rely on the generosity of photographers – it meant that *she* would be the one getting paid as a model.

4.      For Audrey, this was not just rent money, it was stability and control over her future.

5.      Unbeknownst to Audrey at the time, she had unwittingly interjected herself into a group of men who would gradually push and exceed her boundaries, promising at first just money to survive and later fame and fortune.  In her quest for independence, Audrey would be sexually exploited and raped by Defendant.

6.      As a child forced to act like adult to survive, Audrey grew to view this behavior as a normal part of her everyday life, unaware that the trauma and abuse she was enduring would haunt her for years.

7.      Plaintiff's life has been anything but easy, with Plaintiff's images going viral and making their way to her Oklahoma high school when she was just seventeen.  Shortly thereafter, Plaintiff dropped out of school, moved to Florida, and turned to the thing Lidestri had taught her would bring her some semblance of financial security: stripping.

8.      When, years later, Plaintiff was approached by a New York Times reporter about Lidestri, Audrey spoke her truth.  In response, Lidestri sued her.

9.      Not willing to be silenced by Lidestri's abusive litigation tactics, Burns now brings this action against Lidestri for his violations of 18 U.S.C. §§2252(A), 2255, 2251, 1595 and 1466(A).

## THE PARTIES

10.      Defendant Lidestri is a citizen of the County of Dutchess, State of New York. Lidestri's last known address is 24 Hillside Drive Poughkeepsie, NY 12603.

11.      Defendant Lidestri operated Teen Starlet out of his home in Hopewell Junction, NY; raped Plaintiff in his home in Hopewell Junction, NY; and initiated a lawsuit against Plaintiff in the United States District Court Southern District of New York.

12.      Plaintiff is a citizen of the United States and not a resident or citizen of the State of New York.

13.      Though Lidestri shut down his child pornography websites several years ago, he remains active in the technology sector.

14.      In January 2025, he launched "MoxieJam" an app which provides its users with custom choices for entertainment based on algorithms and their own selections.

15.      A press release for the new app describes Lidestri as a "renowned technology executive and pioneer in the SaaS industry" and states that he has "consistently demonstrated a knack for identifying market needs and delivering innovative solutions."

16.      SaaS stands for "Software as a Service" and is a delivery model where providers host and manage applications which are available to internet users, typically by subscription.

## JURISDICTION AND VENUE

17.      This action is brought pursuant to 28 U.S.C. § 1332(a)(1) based upon Diversity of Citizenship because the amount in controversy exceeds the sum or value of $75,000.00,

exclusive of interest and costs, and it is between a citizen of New York and citizens or subjects of a different state.

18.    This action is also brought pursuant to 28 U.S.C. § 1331, federal question, pursuant to 18 U.S.C. § 2251 and 18 U.S.C. § 2252.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this is the Judicial District in which Defendant resides.

## FACTUAL ALLEGATIONS

### Plaintiff's Quest to Become a Model

20.    Audrey was born in Durant, Oklahoma on July 1, 1996.  She was raised in a Pentecostal Christian household prior to leaving to live with her mother as a teenager.

21.    When Audrey was fourteen years old, her mother was seriously injured when she was struck by a semi-truck.  Though the family had previously been homeless, they found housing in Oklahoma following the accident.

22.    By this time, Audrey was wise enough to appreciate the tenuousness of their living situation and endeavored to earn money for her family and herself.  Too young to leave school, Audrey identified modeling as a path to explore as it did not require long hours and had the potential to be lucrative.

23.    Audrey soon realized there was a financial component to modeling which would serve as a barrier to her entry: a portfolio.  More specifically, before people would pay her to model for them, she would need a cache of professionally taken photographs of herself demonstrating why she should be selected.  As photographers typically charge money for such photoshoots, Audrey feared her quest to become a model was over before it even began.

24.    Thankfully, Audrey found a photographer who was willing to photograph her free of charge.  The photographer, Jim, informed Audrey that he, too, was aiming to build a portfolio.

25.    Audrey enjoyed herself at the photoshoot; she brought and wore her own clothing, posed in an age-appropriate manner, and felt safe.  Both Audrey and Jim were pleased with the resulting photographs, sharing them on their respective Facebook pages.

26.    Within days, Jim from Castle Rock was contacting Audrey to inform her that another photographer – "Jim Giacomo" – had seen her photographs and wanted to work with her.

27.    Audrey would later come to learn "Jim Giacomo" was an alias used by Defendant James Lidestri.

28.    Upon information and belief, Jim from Castle Rock relayed to Lidestri that Audrey had attended the photoshoot without parental supervision, communicated with him without a parent, and came from a financially unstable household.

**Audrey's First Paid Photoshoot**

29.    Audrey was informed that she would be getting paid for her "test shoot" for Lidestri but that she would need to travel two and a half hours to Dallas, Texas for the shoot.

30.    With her mother still in recovery, Audrey recruited her sister and her boyfriend to drop her off at Jim's studio and pick her up a few hours later.  Audrey agreed that she would pay for gas with the money she received from the shoot.  At sixteen, Audrey's sister was older, but not by much.

31.    Like with the first photoshoot, Audrey arrived with a small selection of her favorite clothing which she believed was flattering and would photograph nicely.

32.     To Audrey's surprise, the photoshoot began outdoors.  Additionally, while the first set of photographs had included both classic and playful poses, the positions Jim was directing her into for these pictures was decidedly different.

33.     At one point Audrey was told to get on her hands and knees as she was photographed from all angles; at another point, she was made to put her hands on the ground while she raised her buttocks and was photographed from behind.

34.     Audrey was initially uneasy with the pose requests but took comfort in the fact the shoot was occurring outdoors.

35.     Audrey was fourteen and it was her second ever photoshoot and the first time she was ever being paid to have photographs taken.  She did not want to be perceived as uncooperative or labeled difficult to work with.

36.     When Jim told her the next shoot would take place inside his studio, Audrey went along.  Inside, Jim provided Audrey with a selection of clothing, informing her Lidestri wanted her to wear it.  The selection included an oversized men's t shirt, a white button-down shirt, and a green g-string bikini.  She was directed to wear heels.

37.     Once dressed, Audrey was placed in front of a bare wall and directed into the same provocative poses she had done outside.  During this portion of the photoshoot, Audrey was also made to pose topless with her hands covering her breasts.

38.     Jim's refrain throughout the photoshoot was that Lidestri was going to love the photographs.  Though Audrey felt uncomfortable, she also viewed this as her opportunity to be discovered and did not want to do anything that would make her seem immature, difficult, or otherwise discourage Lidestri from hiring her again.

39.     For these men, Audrey was the perfect package: young, beautiful, eager to please, minimally supervised, and financially desperate.

**Lidestri Opens Communication with Audrey**

40.     Once Lidestri received the more provocative photographs and, upon information and belief, received information about how the photoshoot went and who was present, he began contacting Audrey directly.

41.     Lidestri told Audrey how much he enjoyed the photographs from her last session and indicated an interest in photographing her himself.  Unfortunately, he indicated, she would not be able to shoot with him in New York until she was fifteen and a half and – even then – those photographs could not be released until she was sixteen.

42.     Audrey was very aware that her family needed income to pay rent and other bills and those payments were not going to wait until she turned sixteen.  Audrey explained her family's difficult financial position and inquired about ways she could continue modeling for him.

43.     Lidestri seized on the moment, suggesting that he would send Audrey money through Western Union if she sent him pictures.  The direction she received was that she should, in sum and substance, "keep being sexy" in the pictures.

44.     Audrey acquiesced with little hesitation.  She first sent him a photograph wearing shorts and a t-shirt that allowed both her underwear and bra to show.  While she believed she was "being sexy," Lidestri was less than impressed.  He directed Audrey to take off more clothing, which she did.

45.     While Lidestri asked her to send naked photographs of herself, Audrey declined, stating she was not comfortable doing so.

46.    Audrey sent the photographs and Lidestri sent her money via Western Union, as agreed.  This pattern continued for years.

**Audrey's Third Photoshoot**

47.    Several months after the second photoshoot, Lidestri arranged for Jim to photograph Audrey a third time.

48.    Realizing how much of her first payment had gone toward gas, Audrey asked to be reimbursed for travel expenses.  Ultimately it was decided that Jim would make the trip to Oklahoma.

49.    Jim and Audrey met in Durant, Oklahoma in late winter or early spring.

50.    The first portion of the photoshoot took place near a lake.  Like before, Jim provided Audrey with a selection of clothing she was to wear for the photoshoot.  Again, Audrey was directed to pose on all fours or with her buttocks in the air while he photographed her from all angles.

51.    Next, Jim and Audrey went to a peanut factory then walked to a nearby abandoned mill.  There, Jim provided her with cut-off shorts which barely covered Audrey's genitals as well as a white t-shirt.  Audrey was directed to take off the top while keeping her nipples covered as Jim photographed her.

52.    By this time, Audrey was almost fifteen and a half – the magic age Lidestri had provided whereby she would be legally old enough to be photographed by him in New York. She began asking to schedule the trip, but Lidestri was avoiding it.

53.    For months, Audrey continued to message with Lidestri one-on-one and was still sending him the "sexy" photographs he was requesting – albeit not as "sexy" as he wanted.

Before long, however, Audrey was sixteen and Lidestri had still not booked her that promised trip to New York.

54.    Audrey worried Lidestri was going to go back on his promise to fly her to New York.

55.    Audrey began to withdraw from her communications with Lidestri, making herself less available and sending fewer and less provocative images.

56.    Lidestri began asking her if her body type had changed, whether she had any bruises, and whether she had put on any weight or gotten bigger.  He told her that if she wanted to model for him then she was not allowed to change her hair, get piercings or tattoos, or gain weight.

57.    This charade continued each time Audrey withdrew from the relationship or seemed unenthusiastic about sending photographs, with Audrey needing to prove her appearance and worth to get back into Lidestri's good graces each time.

58.    Despite his implicit threats, Lidestri consistently assured Audrey that she was his "favorite" and he was going to "take [her] places."

59.    As her appearance never substantially changed, Audrey now suspects Lidestri's resistance was related to him learning her mother was not going to allow her to go to New York without her.

60.    At Lidestri's request, Audrey asked her mother if her sister could accompany her instead, but Audrey's mother was insistent that she make the trip, no matter how physically taxing it would be for her.

**Audrey's All-Expense Paid Trip to NYC**

61.     In April of 2013, Audrey and her mother flew business class from Oklahoma to New York, where they stayed at a hotel in Times Square.  Both the tickets and the hotel were paid for directly by Lidestri and, prior to the trip, Lidestri sent Audrey a Western Union payment for travel incidentals such as taxis and food.

62.     Lidestri also asked Audrey what her mother liked to eat and drink, indicating that he would be sure to purchase it in advance of the photoshoot.

63.     When Audrey and her mother got to their room, they found at least ten $100 bills lined up on the bed alongside a bag from Juicy Couture.

64.     As a sixteen-year-old from Oklahoma who had been homeless just a couple years earlier, Audrey was beside herself.

65.     Lidestri picked up Audrey and her mom and drove them around Manhattan.  They drove past the Statue of Liberty and then to the National Museum of the American Indian, which was closed.

66.     Ultimately, the trio walked around Times Square, visiting the M&M Factory and a few other stores and tourist traps.  At the end of the evening, Lidestri dropped Audrey and her mom off at the hotel, warning Audrey not to eat anything prior to the photoshoot.  He told Audrey and her mom he would be back the next day to pick them up.

67.     It was at this point that Audrey began to appreciate that the photoshoot would be taking place at Lidestri's home.

**Lidestri's Upstate Photoshoot: Day One**

68.     Lidestri arrived at the hotel as planned, picking up Audrey and her mom for the long trek back to his house.

69.     Audrey recalls being nervous and growing increasingly uncomfortable during the long drive.  She was simultaneously nervous about what was about to happen, but also that her mom would "find out" and put an end to her modeling career.

70.     Audrey was immediately impressed with the size of Lidestri's home and in awe of the pink cherry blossoms which surrounded his long driveway.  The interiors were modern and well-kept.  Being in the home only supported Lidestri's representations that he was a successful photographer.

71.     Audrey began to hope that, one day, perhaps she could afford to live in a home this nice.

72.     Meanwhile, Lidestri was rolling out the red carpet for Audrey's mom, offering her favorite food and beverages.  His tour of the house ended with him dropping off Audrey's mom in his in-home theatre.  Lidestri showed her the fridge, which was stocked with Michelob Ultra – her favorite – and told her to get comfortable and order herself anything she wanted to watch.

73.     Audrey's mom, still heavily medicated from the accident and exhausted from traveling and walking the day before, plopped down into a chair and did just that.

74.     Once Audrey's mom had been deposited in the basement, Lidestri took Audrey back upstairs to his kitchen table.  There, he showed Audrey pictures of swimsuit and Playboy models he indicated were to serve as inspiration for the photoshoot.

75.     Lidestri told Audrey that the inspiration photos were all part of his and Jim from Castle Rock's portfolios – images he and Jim had captured of women they had made famous.

76.     The models were wearing the same type of g-strings she had been made to wear in previous shoots.  The photographs were not raunchy and the women were not naked.  In fact, even though the women were in bathing suits, they looked classy and beautiful.

77.     Audrey relaxed.  If these were the types of photographs Lidestri was going to take, her fear was unwarranted.  Audrey's excitement again grew.

78.     It was at this point Lidestri mentioned that she would be compensated by the day, meaning if she returned to his home the following day she would be paid additional money.

79.     The day before, Audrey had woken up in Oklahoma and flown business class to New York.  That night she slept in a hotel in Times Square and she was now sitting in a big house with a professional photographer who was promising to make her famous.  Audrey believed this was her moment.

80.     Audrey showed Lidestri her favorite top she had selected for the shoot and Lidestri said he would provide the bottoms.  Everything he had, he indicated, was new or had been washed.  The shirt Audrey had chosen had an open back and, when they were testing the light, Lidestri directed her to turn it around so the slit was in the front.

81.     With her shirt on backward, the only thing preventing her breasts from being exposed was her hands.

82.     Next, Lidestri provided Audrey her with black g-string underwear, offering to turn around if it made Audrey more comfortable.  Audrey said it would, and he obliged.

83.     The plan was for Lidestri to talk her through the photoshoot while he photographed the interaction and then they would repeat the poses while Lidestri videotaped her. The strategy was to make it seem like there was "behind the scenes" footage when, in reality, there was just one photographer and they were reenacting prior poses.

84.     From there, Lidestri coached Audrey through what he called "slips" which involved Audrey playing with her top and pretending to fumble her grasp so as to partially expose her nipple.

85.     As Lidestri photographed and filmed Audrey, he constantly groaned to himself and grabbed at his groin.

86.     When Audrey's "slips" were not to his liking, Lidestri brought her a Michelob Ultra.

87.     Audrey drank the beer quickly, growing relaxed and more amenable to Lidestri's direction.  Once the photographing was done, Audrey recreated the same poses while Lidestri videotaped her.

88.      Next, Lidestri put her in an "I Love NY" shirt which she had purchased the day before.  To Audrey's surprise, Lidestri had cut it up to make it more revealing.  Lidestri coached Audrey through more "slips" as he photographed, then they again recreated the poses as he filmed.

89.     After her "I Love NY" photoshoot, Lidestri brought her another beer and then the two went to a bedroom.  Lidestri brought out a new camera and told her to lay on the bed and relax.

90.     First, Lidestri told Audrey he was going to make her feel calm.  Next, he asked if she had been with a man before.  Audrey told Lidestri that she had once kissed a boy in the fourth or fifth grade, but her father had learned about it and freaked out.

91.      By this point, Lidestri was already on top of Audrey, weighing down the lower part of her small body with his.  He then performed oral sex on Audrey while she laid there silently with her fists and jaw clenched.

92.     When Lidestri decided he was done, he stood up, turned off his camera, and provided her with a wad of $100 bills.

93.     Lidestri warned Audrey not to tell anyone about what had just happened, explaining they could both get in trouble for the past photoshoots.  He provided Audrey with a white outfit and the two did another photoshoot in his bed.

94.     By this point Audrey was shutting down and having difficulty following directions.  Lidestri told Audrey to take a break so she grabbed some food and went down to see her mom, who she found passed out in the theatre.

95.     Lidestri and Audrey shot in one other room that day – this time in a different bedroom.  With Audrey still struggling, Lidestri ended the shoot.

96.     Lidestri was filled with excitement on the car ride back to Manhattan, regaling Audrey's mom with how talented Audrey was, how famous she was going to become, and the need to pick a fake name so men would not try to find her.

97.     Audrey was hungry, upset with what had just happened, and angry with her mother.  She was quiet for the majority of the trip to the hotel.

**Lidestri's Upstate Photoshoot: Day Two**

98.     Audrey woke up determined to get the photoshoot over with and make money.

99.     Unlike the day before, Audrey's mom was present and walking around the house.

100.    Like the first day, Lidestri made audible groaning noises as he photographed and filmed Audrey and constantly adjusted himself.

101.    During their a session, Audrey's mom called up the stairs to see whether they were done and, without even finishing the shoot, Lidestri said, in sum and substance, "let's go, you're done."

102.    Audrey attributed the short duration of the shoot to her mother's presence around the house and felt angry her mother had passed out the day before.

14

103.    Lidestri and Audrey met up with Audrey's mom at the kitchen table, stating this was the "fun part" where Audrey's mom needed to sign Audrey's contracts and they would pick out a name for Audrey.

104.    Audrey's mom signed the contracts on the spot and the group decided that, moving forward, Audrey would be known as "Kris Karson."

105.    Audrey's mom asked to see examples of the photographs he had taken, but Lidestri assured her that they first needed to be edited and he would show them to her before they were used.

106.    Lidestri returned Audrey and her mom to their hotel and they flew home the following morning.

107.    Lidestri purchased the domain name "KrisKarson.com" within one month of Audrey's New York trip.

**Audrey a/k/a Kris Karson Gains a Following**

108.    Before long, Lidestri began telling Audrey that he had posted her content online and fans were loving her pictures.

109.    Lidestri even sent Audrey an Android on which she could interact with her fans.

110.    Realizing she was finally in a position of power, Audrey also asked for Lidestri to pay for her personal phone; Lidestri agreed.

111.    Still a teenager attending high school, Audrey was not always prompt to engage with her fans.  When Lidestri learned this, he began to threaten Audrey that if she did not do her job, she would be in breach of contract and would owe him $250,000.  Lidestri warned that he knew Audrey did not have the money so she had better start holding up her side of the deal.

112.    Thereafter, Audrey endeavored to spend at least thirty minutes of every day responding to vulgar and disgusting things sent to her by perverted internet trolls.  When Audrey did not understand what they were saying, she would thank them or send emojis.

113.    This went on for more than a year, with Audrey even skipping prom to be part of another photoshoot which Lidestri had arranged with a different photographer.

**Florida Photoshoot**

114.    When Audrey turned 17, Lidestri invited her to a photoshoot in Florida, which Audrey agreed to do only if another person was present.

115.    Audrey and the other model arrived before Lidestri and took the opportunity to compare their experiences with Lidestri.  They made a pact with one another never to leave one another alone in a room with Lidestri.

116.    Though Lidestri carried on grunting and groaning as he typically did, the photoshoot occurred without incident until the other model requested permission to get a tattoo.

117.    Lidestri told the other model "no," explaining that the more tattoos she got, the less childlike she would appear. Eventually, he told the model that he would agree to it only if she and Audrey allowed him to photograph them both naked.

118.    The model begged Audrey and, feeling like she owed it to the other girl for remaining true to their pact, Audrey eventually agreed.  At Lidestri's urging, Audrey and the other model pretended to kiss one another as Lidestri photographed them naked.

119.    With two months left in her Junior year of high school, Audrey's images went viral as she was dubbed one of the "10 Best Asses" on Vine.  The video quickly spread throughout school where she was relentlessly mocked and bullied her for being "Kris Karson."

120.     Even Audrey's uncle found out about it and decided to take it as an invitation to walk in on her when she was showering.

121.     At 17, Audrey saved her money and moved to Florida, where she lived in her car until she made enough money stripping to rent a room from a co-worker.

**Lidestri Reopens Communication**

122.     After Audrey turned 18, Lidestri reached out to her and told her it was time for her own website.

123.     Lidestri said that he had been keeping track of Audrey through social media, saw that she was taking care of herself, and said that this was an opportunity for her.

124.     Audrey agreed, warning Lidestri that she would no longer work for pennies, that she now understood how much he was making off of her, that she was no longer afraid of her mom finding out, and that she now knew her worth.

125.     Once Audrey turned 18, Lidestri photographed her on one occasion.  Shortly thereafter, realizing no amount of money was worth seeing Lidestri again, Audrey cut off communications.

**Audrey's Struggles Post-Lidestri**

126.     Meeting Lidestri forever shaped Audrey's life.

127.     Though Audrey was already on a difficult trajectory after her mother's accident, Lidestri's influence made certain she would never experience the ease or joys of childhood.

128.     Lidestri targeted and preyed on Audrey due to her family's financial hardships, exploiting Audrey because he knew she was unsupervised, naïve, and desperate.

129.    Because of Lidestri, Audrey's first experience with sexual intimacy was being pinned down by a middle-aged man performing oral sex on her against her will.

130.    Because of Lidestri, Audrey would not attend prom, would not graduate high school, and would begin stripping to survive before she even turned 18.

131.    To this day, Audrey continues to experience intimacy issues because of what Lidestri did to her.

132.    Audrey has further experienced an uphill battle with substance abuse.

133.    While Audrey would prefer to work in a professional setting, she is also keenly aware that she continues to have throngs of fans who are willing to compensate her for her intimate images and videos.

134.    As a result, even though Audrey does work a "normal" job, she also frequently falls back on OnlyFans-type work when her financial circumstances require it.

135.    To this day, Audrey is still contacted by men who remember her and possess images and videos of her as a minor and who implore her to send them unreleased content from when she was a child.

136.    At least two of these men have informed Audrey that they purchased and possess the video of Lidestri performing oral sex on her when she was a child.

137.    Audrey is at once reliant on and resentful of her status as a child sex symbol. While she desperately dreams of a life where she had never met Lidestri, she also recognizes her notoriety provides her with the ability to earn money when times are difficult.

138.    Though Audrey knows her hardships are largely attributable to the exploitation she endured early in life, it is the only life she has ever known.

**Audrey Speaks, Lidestri Sues**

139.    In late 2024, Audrey was contacted by a New York Times reporter.

140.    The reporter was in the process of writing a series about underage female social media influencers and had been provided with Audrey's name by a fellow Teen Starlet model who Lidestri had exploited.

141.    In one article which was published on November 10, 2024, the New York Times wrote that they had contacted Lidestri for comment about his website and Lidestri "said that he was a tech entrepreneur, no longer in the photography business, and had provided information to law enforcement about 'people who weren't playing by the rules.'"

142.    The article went on to state that one child influencer featured on one of Lidestri's websites was earning tens of thousands of dollars monthly before Lidestri shut down the site in 2022, first offering to sell the business to the girl.  Rather than buy the business, the sixteen-year-old girl created her own website.

143.    Another piece from the series, this one published on December 30, 2024, was entitled "The Men Who Use Instagram to Groom Child Influencers[.]"

144.    The article (annexed hereto as Exhibit "1") focused heavily on Lidestri, including one woman's report that, at seventeen, he bought her a "sex toy and offered her money for a video of her using it[.]"

145.    Multiple other victims of Lidestri came forward with stories similar to Audrey's, though Audrey was the only one who admitted to being sexually assaulted by him.

146.    Miraculously, some of the women still possessed their text message exchanges with Lidestri, with one woman showing messages which included dozens of requests for graphic

videos, despite the minor asking to stop, followed by "You don't want to make a few hundred dollars?" and "What are your alternatives?"

147.    Despite allegations of sexual impropriety or exploitation by all the women interviewed about Lidestri, Audrey is the only one he has chosen to sue for speaking out about the trauma she endured.

**Lidestri's Child Sex Abuse Material Empire**

148.    Lidestri purchased the domain name www.TeenStarlet.com on or about January 22, 2010.

149.    Upon information and belief, Lidestri owned and operated the membership-based websites on which he both sold images and videos of teenage girls and also sought photographers throughout the country and beyond.

150.    Upon information and belief the photographers would then work with Lidestri to locate and acquire "talent" – young girls who they would photograph and record and then present to Lidestri for his approval.

151.    Upon information and belief, once Lidestri had approved the girls, they would then be photographed and recorded by various photographers, including Lidestri himself. Sometimes, like with Audrey, Lidestri would fly the girls to other states to be photographed and recorded.

152.    Upon information and belief, the trips were presented as incentives to the girls to encourage them to interact with their fans, remain fit, and, most importantly, produce more and more content for the sites.

153.    Over the years, no fewer than 79 teenage girls appeared on Lidestri's Teen Starlet website.

154.    While Audrey does not recall how many sets she took with Lidestri and his other photographers prior to turning 18, evidence of Lidestri's uploads remains available online.  At a minimum, Lidestri uploaded the following "sets" depicting Audrey in various states of undress while she was a minor; each set contained multiple images of Audrey and typically was accompanied by a video showing "behind the scenes" content including Audrey's genitals and breasts:

a)  Amazeballs
b)  A Little Patience
c)  A Real Stunner
d)  Bad Reputation
e)  Banded in Black
f)  Bikini Session
g)  Black Tie Event
h)  Black Widow
i)  Brace Yourself
j)  Bubble Bath
k)  Clean Sheets
l)  Come on Up
m) Crouching Tigress
n)  Down n Dirty
o)  Dream Come True
p)  Dreams Are Made Of
q)  Dress Code Violations
r)  Dusting Off
s)  Feeling Blue
t)  Fill My Eyes
u)  Finally Here
v)  Flight Pattern
w)  Flight of Fancy
x)  Garters Bows
y)  Getting Wet
z)  Gift for You
aa) Go Os
bb) Going Clubbing
cc) Grab a Chair
dd) Hello

ee) Hello Pasties
ff) Hugging the Curves
gg) I Love NY
hh) In the Air
ii)  Jingle Bells
jj)  Just a Button
kk) Little Devil
ll)  Lounge Around
mm)        Magnificent Lace
nn) Morning Memory
oo) My Lollipop
pp) My Apology
qq) My Booty
rr)  My Jeans
ss) Night Vision
tt)  Orange Pee
uu) Orange You Glad
vv) Overhead
ww)        Party in the Back
xx) Passion Fruit
yy) Patiently Waiting
zz) Babydoll
aaa)        Plunging Neckline
bbb)        Pumping Iron
ccc)        Quick Change
ddd)        Ready Made
eee)        Red Heat
fff) Red Wedding
ggg)        Ripped in Pink
hhh)        Rise and Shine

iii) Rusted Shorts
jjj) Seeing Red
kkk)        Served Up
lll) Sleepy Time
mmm)        Soft Edges
nnn)        Southern Belle
ooo)        Sparkling
ppp)        Split Decision
qqq)        Step on Up
rrr) Summer Dress
sss)        Splendid Belief

ttt) Sweet as Honey
uuu)        Sweet Dreams
vvv)        Through the Net
www)        Time to Unwind
xxx)        Too Cute
yyy)        What Gown
zzz)        White Queen
aaaa)        Wrapped in Stripes
bbbb)        Yoga Anyone
cccc)        Yoga Pans
dddd)        Zigzag

155.    Photographs and/or videos of Audrey as a minor hosted by Lidestri and sold on his sites depicted Audrey engaging in actual or simulated masturbation, actual or simulated sexual intercourse, and lascivious exhibition of the anus, genitals, or pubic area.

156.    Some of the content was captured by other photographers and some of the content was captured by Lidestri, however all of it was published on his websites and sold by him through his membership-based websites.

157.    Lidestri purchased the domain name www.SelectSets.com on or about February 1, 2011.

158.    Lidestri purchased www.Honey-Cream.com on or about February 12, 2013. Honey Cream was designed to host images of Lidestri's older girls and on July 25, 2013 was advertising that it was in search of "18-21 year old female models."

159.    Upon information and belief, once the Teen Starlet girls turned 18, Lidestri would begin to post their content on Honey Cream and Select Sets, regardless of when the photos and videos were captured and/or whether they contained sexually explicit conduct.

160.    As his teen models grew in popularity, Lidestri also created websites using their stage names.  Audrey's website – www.KrisKarson.com – was purchased shortly after her New York photoshoot.

161.    Other websites purchased by Lidestri in the names of other teen models included Kelsey-Monroe.com, GeenaMullins.com, BrookeandBrandi.com, BrandiBlair.com, AlexArabella.com, ShayAdams.com, AmandaVerona.com, MiaVesela.com, SofiNovak.com, AylaRoss.com, LucieLaska.com, DanniDawn.com, PetraPetacova.com, SheriBelle.com, MayaLayne.com, TeenKelsey.com, MelissaManzoni.com, ChastityVal.com, and CaliSkye.com.

162.    Lidestri also owned and operated websites such as TeenStarletEuro.com, TeenStarletLatinas.com.

163.    Lidestri's collection of child sex abuse material ("CSAM") was prolific.  Though Lidestri appears to have removed his known websites, former members have republished portions of photoshoots throughout the internet en masse.

164.    The majority of the images still contain Lidestri's logos.

## FIRST CAUSE OF ACTION
### (Violation of 18 U.S.C. §2252(A), 2255)

165.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

166.    Plaintiff was 14 years of age at the time Defendant Lidestri first began soliciting intimate photographs and videos of Plaintiff both from Plaintiff directly and through his intermediary, Jim.

167.    Plaintiff was 16 years of age when she was sexually assaulted at James Lidestri's house as Lidestri filmed it.

2

168.    Plaintiff was 17 years of age when Lidestri photographed her naked and pretending to kiss and engage in sexual intercourse with another minor girl.

169.    Upon information and belief, the images and videos captured by Jim were sent to Lidestri electronically.

170.    Upon information and belief, the videos and images captured by Lidestri were disseminated to third parties and/or shared on his many websites.

171.    The photographs and videos of Plaintiff show sexually explicit conduct in that they show the lascivious exhibition of Plaintiff's anus, genitals, or pubic area and/or show lascivious simulated sexual intercourse where Plaintiff's genitals, breast, or pubic area was exhibited and/or constitute sexual intercourse, specifically oral-genital intercourse.

172.    The content was captured when Plaintiff was between 14 and 17 years old.

173.    Pursuant to 18 U.S.C. § 2255, "[t]here shall be no time limit for the filing of a complaint commencing an action under this section."

174.    Plaintiffs demand judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## SECOND CAUSE OF ACTION
### (Violation of 18 U.S.C. §1466A)

175.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

3

176.    Lidestri knowingly produced, distributed, received, and possessed with intent to distribute visual depictions of Plaintiff engaging in obscene sexually explicit conduct when she was a minor.

177.    The visual depictions contained imagery of Plaintiff, as a minor, engaging in oral-genital sexual intercourse with Lidestri and of imagery of Plaintiff appearing to engage in sexual intercourse with another minor female model.

178.    The visual depictions lack serious literary artistic, political, or scientific value.

179.    The visual depictions were communicated via e-mail using computers and/or cell phones, which are instrumentalities of interstate or foreign commerce.

180.    As a result of Defendant's conduct, Plaintiff was harmed.

181.    Plaintiffs demand judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

### THIRD CAUSE OF ACTION
### (Violation of the Mann Act, 18 U.S.C. §§2422, 2255)

182.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

183.    At all relevant times, Plaintiff was a minor under the age of eighteen.

184.    Defendant knowingly used facilities of interstate and foreign commerce, including the internet, email, and telephone, to persuade, induce, entice, and coerce Plaintiff to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b).

185.    Defendant also arranged for and caused Plaintiff to travel in interstate commerce for the purpose of engaging in sexual activity for which Defendant could be charged with a criminal offense, in violation of 18 U.S.C. § 2422(a).

186.    Defendant's conduct constitutes a violation of 18 U.S.C. § 2422, one of the predicate offenses for which Congress has expressly created a civil remedy under 18 U.S.C. § 2255.

187.    Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, and/or maintained Plaintiff for the purpose of causing her to engage in one or more commercial sex acts, within the meaning of 18 U.S.C. § 1591(e)(3).

188.    As a result of Defendant's conduct, Plaintiff was harmed.

189.    Plaintiff demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## FOURTH CAUSE OF ACTION
### (Violation of the Mann Act, 18 U.S.C. §§2423, 2255)

190.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

191.    At all relevant times, Plaintiff was a minor under the age of eighteen.

192.    Defendant knowingly transported Plaintiff interstate with the intent that Plaintiff engaged in sexual activity for which any person can be charged with a criminal offense.

193.    Defendant also traveled interstate with the intent to engage in any illicit sexual conduct with Plaintiff.

194.    As a result of Defendant's conduct, Plaintiff was harmed.

195.    Plaintiff demands judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for her severe injuries as well as an amount sufficient to punish Defendant for his willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiff together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in their favor and against Defendant, containing the following relief:

A.    An award of damages against Defendant in an amount to be determined at trial, but not less than $150,000.00 per image and video shared, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

B.    An award of punitive damages, and any applicable penalties and/or liquidated damages in an amount to be determined at trial;

C.    Prejudgment interest on all amounts due;

D.    An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

E.    Such other and further relief as the Court may deem just and proper.

Dated: New York, New York

September 9, 2025

Respectfully submitted,

**Veridian Legal P.C.**

_/s/ Daniel S. Szalkiewicz_
By:    Daniel S. Szalkiewicz, Esq.
         Cali P. Madia, Esq.

23 West 73rd Street, Suite 102
New York, NY 10023
Telephone: (212) 706-1007
Facsimile: (646) 849-0033
cali@veridianlegal.com
daniel@veridianlegal.com

*Attorneys for Plaintiff*

# Exhibit
# 1

*The New York Times*

https://www.nytimes.com/2024/12/30/us/child-influencers-photographers-abuse.html

**MANY MEN WHO FOLLOW CHILD INFLUENCERS** online seek salacious images of them, often from their parents. The boxes below represent descriptions of images that appeared in court documents or were found online.

A 12-year-old girl in a tanktop and underwear poses on all fours, arching her back.

A preteen girl in a tank top pulls down her underwear straps below her hips.

A close-up of a young girl's genitals, barely covered by a G-string bikini.

A 12-year-old girl on a bed, lying on her side. She is in the process of pulling down her underwear.

A 13-year-old girl pulls up her tank top.

A 12-year-old girl spreads her legs while

exposing the lower portion of her breasts.

lying on a bed.

A 13-year-old girl wearing a bikini, show-
ing her rear end to the camera.

A young girl lying on her back on a bed
with her legs in the air. Stuffed animals
appear around her.

A 12-year-old girl on all fours crawling on
a bed.

A preteen girl is wearing a long white
dress shirt and no underwear; her private
areas are visible.



A 13-year-old girl poses in a red silk robe, a white bra and red silk shorts.

A young teenage girl faces a mirror in bra pulls her bikini bottoms upward, exposing her pubic area.

# The Men Who Use Instagram to Groom Child Influencers

Photographers and other men offer to build online followings for young girls, but some are pedophiles who work with parents to sexualize them.

---

▶ Listen to this article · 24:45 min   Learn more

  **By Jennifer Valentino-DeVries and Michael H. Keller**

The reporters have spent more than a year investigating child influencers, the perils of an industry that sexualizes them and the role their parents play. This is the fifth article in a series.

Dec. 30, 2024

Everyone had an idea about how the 12-year-old girl should pose in a G-string bikini as they assembled in an Airbnb rental home in a small Louisiana town.

The photographer was new to the business of shooting child influencers, so he welcomed suggestions, he later explained in an interview.

The girl's mother, swiping through images of women from men's magazines on her phone, recommended that she stand with one leg raised provocatively on a bed, he recalled. The girl, he said, proposed imitating a scene from an erotic film she had watched — she would lie on her back with her hands grasping for the bedposts.

In the end, several shots positioned her "head on a pillow and her buttocks raised in the air," and in one, the camera focused on her "barely covered" genitals. That was the description in court documents, written by federal authorities who charged the photographer and mother with crimes related to child sexual abuse material.

"We just provided what we knew that men wanted to purchase," the photographer, Grant Durtschi, said by telephone from a jail outside Baton Rouge.

For the past year, The New York Times has been investigating how a drive for online fame has created a marketplace on Instagram of girl influencers who are managed by their parents — Instagram does not allow children under 13 to have their own accounts — and frequently draw an audience of men.

Some of the parents, like the Louisiana mother, develop monetary relationships with the men, selling them images of the girls. Others also offer chat sessions with them and even sell their worn leotards.

Those looking to supercharge their daughters' online presence sometimes tap into an established network of men, The Times found, many of them convicted of sex crimes or accused of pedophilia, who participate in the grooming of children under the guise of working as social media professionals.

Among them was Mr. Durtschi, who pleaded guilty in March 2023 to producing child sexual abuse imagery, sometimes legally known as child pornography, during the photo shoot with the 12-year-old. He had been arrested a year earlier in San Francisco.

The men present themselves to parents — almost always mothers — as photographers, social media experts or web technicians who can create photo-selling sites for them. Some go even further, working with mothers to produce ever more sexualized content as they cultivate inappropriate relationships of their own with the daughters.

In rare cases, people like Mr. Durtschi and the 12-year-old's mother are prosecuted. But The Times found multiple instances in which allegations of pedophilia and possible criminal conduct circulated widely in the child-influencer world or had been reported to law enforcement with no known consequences.

One popular photographer gained millions of followers across social media despite rumors of inappropriate behavior with children. Documents reviewed by The Times revealed a reason behind some of the rumors, showing that he lost custody of his two minor children in 2011 after he was accused of sexually abusing his daughter, who was 7 at the time. The Los Angeles County children's court determined the allegations were credible.

That photographer, David Hofmann, was also accused by a former girlfriend of masturbating while in bed with one of her daughters when she was not much older. The mother filed a police report against Mr. Hofmann and posted other allegations against him on Facebook. The girl, now 20, confirmed her mother's account of the incident in an interview with The Times.



Ann Harris, left, and her daughter Avaree have accused an Instagram photographer of sexual misconduct. Kholood Eid for The New York Times

Mr. Hofmann, who was not charged with a crime in either case, continues to take photos of young girls. He denied in an interview that he had ever acted inappropriately with his daughter or any other girl.

He said that his ex-wife had "coached" his daughter and that his former girlfriend was "out to get" him. He also said that the children's court system was biased against men and that the investigation into him was "meaningless" because it did not meet criminal standards.

Another man, James Lidestri, who ran multiple websites that sold photos of scantily clad minors, bought a 17-year-old girl a sex toy and offered her money for a video of her using it, text messages between the two of them show.

When the girl sent a video she described to The Times as explicit, he responded, "Outstanding, thank you 😍," according to the texts.

Mr. Lidestri has not been charged with a crime, and the exchanges with the 17-year-old were not reported to the police. He issued a statement through a lawyer saying that he "categorically denies sexually abusing or exploiting anyone, let alone a minor."

The lawyer, Peter E. Brill, said, "He entered this business because there was a demand for ethical professionals in an industry that was lacking them."

A man in Georgia, Michael Allen Walker, promoted himself as a social media expert, promising mothers that he could bring their daughters tens of thousands of followers. The Times tracked Mr. Walker's operation to a state prison in Georgia, where he is serving a 20-year sentence after pleading guilty to the sexual exploitation of children.

Mr. Walker ran his social media business under a pseudonym and was probably using a contraband cellphone to communicate with the mothers. He bragged on Telegram, a messaging app, about having seen images of child influencers in sexual situations; his account was still active this month when The Times reached out to prison officials for comment.

A spokeswoman for the Georgia Department of Corrections said that Mr. Walker was being monitored for illegal activity and that an investigation was in progress.

The mother in Louisiana is set to go on trial next month. The Times is withholding her and other mothers' names to protect the identities of their children.

The woman's lawyer, Jarrett Ambeau, said in an interview that selling sexualized photos of children should perhaps "be made illegal." But he denied that she had directed any of the shots. He said the mother had not been aware of all of the photos taken by Mr. Durtschi, and that she was not guilty of crimes related to child sexual abuse material.

"She just didn't do it," he said.

After multiple attempts to reach Mr. Durtschi, he contacted The Times this summer and said he was ready to talk to the media for the first time. He had spent more than a year in jail — mostly in solitary confinement, choosing it for his safety, he said — and is now awaiting sentencing.

In a series of interviews, he took responsibility for his crimes but criticized social media for normalizing child exploitation by making it so easy for parents and predators to connect. Forbes reported in 2022 that Mr. Durtschi continued to use Instagram to share images of minors even after he was arrested and charged.

"Instagram is the engine," Mr. Durtschi said. "If you're going to get on Instagram, you're playing with fire."

In a statement, a spokesman for Meta, which owns Instagram, said the company had placed various protections on teen accounts to limit interactions with strangers. For underage accounts run by a parent, the parent is responsible for the "content, privacy settings and any interactions with others," said the spokesman, Ryan Daniels.

"We use technology to prevent potentially suspicious accounts from interacting with teen accounts and accounts that predominantly feature minors, as well as from finding each other," Mr. Daniels said, "and we're continuing to expand this technology."

## 'Not Spread Eagle'

The Times viewed thousands of Instagram accounts and tracked months of conversations by professed pedophiles on Telegram. Reporters also examined thousands of pages of police reports and court records and interviewed nearly 200 people associated with the child-influencer industry, including felons and alleged victims who had never before spoken publicly.

The investigation uncovered reports of dozens of men offering services to child influencers as either a business or hobby. Almost all of them declared a sexual interest in minors or fostered relationships, both online and in person, with the children and their families.

In North Carolina, a photographer named Larry Vincent Wagner, who had run a site called Starlight Nation that offered photos of girls, is now in prison after pleading guilty in January to charges of possessing illegal images of children.

In 2022, a popular Instagram teen-modeling photographer who went by the name Christian Paprika was convicted in his native Hungary of persuading girls interested in modeling to engage in sexual relations, the court said in a statement reported by Hungarian media.

Another photographer, Christopher Alexander Reilly, pleaded guilty in Texas in 2017 to downloading videos depicting child sexual abuse. The authorities also found surreptitious videos he had taken of young girls' clothed genital areas, according to a spokesman for the U.S. attorney's office in San Antonio.

In many cases, The Times found, predators and complicit parents proclaiming their innocence said they had carefully navigated the legal boundaries.



Taylor Compton, who started modeling as a young teenager, said she was pressured into sending explicit imagery.  Kholood Eid for The New York Times

"There's that fine line that they make sure they emphasize," said Taylor Compton, the former teen model who shared her text message exchange with Mr. Lidestri. She said he and others would often assure her that "technically, because you're not spread eagle, it's fine."

Steve Grocki, the top Justice Department official for child exploitation issues, said federal law did not require exposed genitals for an image of a child to be illegal. Other factors matter, like the setting and purpose of the photos, he said.

"It can be transparent clothing or clothing that is partially covering," he said.

Mr. Durtschi cited photos taken by Mr. Lidestri as blurring the legal line for him and other photographers. "Everybody that's out there thinks they're being shown photos that are deemed legal," he said, adding that legal or not, he now understands sexualized photos are harmful to children.

Time and again, parents and victims expressed exasperation to The Times that so many of these men kept operating. Ann Harris, the former girlfriend of Mr. Hofmann, the California photographer, said she went to the police in Brea, Calif., several years ago. But she got the impression her case wasn't a priority because it didn't involve a violent crime and she and her daughter had moved away.

A spokesman for the police in Brea did not comment on her report.

## Hooking the Parents

The men on Instagram often follow a similar playbook when building relationships with child influencers and their mothers.

---

**Got a confidential news tip?** The New York Times would like to hear from readers who want to share messages and materials with our journalists.

See how to send a secure message at nytimes.com/tips

In one technique, they message mothers on Instagram, asking to buy additional photos not featured on their accounts. The requests seem like safe, easy money, said a mother in Florida, but she later learned they could disguise a sinister intent.

"They're doing that to groom that parent, to see if they could get something more," said the mother, who related several examples of mothers being lured.

She said the men often dropped the names of other child influencers to bolster their own credibility and make mothers jealous and competitive.

Another mother in California recalled how a man reached out to her on Instagram, saying he had once run an agency called Florida Teen Models and had a program for helping girls and their mothers sell content privately. Wary of such men, she recorded their conversation, which The Times reviewed.

The man described how he and others fostered interactions with mothers and children and endeavored to get content from them. He explained that he ran "shout-out" pages on Instagram that helped increase their audience. He sent girls bikinis, promising promotion on his pages if they posted photos in them.

At first, another mother in Florida said, she found such overtures exciting. "How cool, right?" she said. "Somebody sees that my 5-year-old is talented." But it quickly became clear to her that the men were interested in the girls sexually.

Some of the predators try to develop personal or romantic relationships with mothers to gain access to their children.

One of them told parents that his work was inspired by the death of his own teenage daughter, but reporters, who identified the man and traced him to a town near Indianapolis, found no merit to his claim that he ever had a daughter.

The man told a mother sexualized stories about the girl, an apparent effort to get her to make her own daughter available to him.

He and other men have regularly styled themselves as protectors against other pedophiles, claiming to have special knowledge of how to navigate the dark side of the internet.

But perhaps the most potent enticement for mothers is money — from a few dollars here and there as a "donation" to tens of thousands of dollars for photos and worn clothing. The Florida Teen Models man said that one client had paid him about $25,000 over several years.

In the case of Mr. Durtschi, the photographer in jail in Louisiana, a search warrant for some of his Google Drive accounts revealed that he had made about $14,000 for photos over three weeks in 2021. That year, the Louisiana mother of the 12-year-old and another mother sued him, saying in part that he had sold some photos without paying them or receiving their permission. They were seeking at least $200,000.

The mothers said in the lawsuit that Mr. Durtschi had sold some of the photos beyond their "approved and verified" buyers.

In a court filing, Mr. Durtschi said the mothers knew that "the money is all coming from older men who pay to see content of underage girls who are being as inappropriately sexy as they can get them to be. Most of the world would call these pedophiles."

Mr. Durtschi listed more than two dozen people he said were involved in a network that produces sexualized images of child influencers. He also submitted photos of the two women's daughters that had been taken by other photographers. The images were so sexually revealing that the judge said they could be illegal.

Mr. Durtschi, who resided in Texas, said he was drawn into the child-influencer world through a combination of his sexual attraction to children and the ease of approaching them through Instagram. In 2021, he said, he was browsing Instagram and came across an 8-year-old cheerleader who lived nearby. He reached out to the mother and proposed a photo shoot.

The first sessions consisted of innocent shots in a park, he said, but after a few weeks, he suggested they sell racier photos to make money. The mother was interested, he recalled, but insisted it be kept quiet. He reached out to pedophiles on Telegram. "It went to the guys I most trusted," Mr. Durtschi said.

He also paid the mother for photos only for him. In one, the girl was fully nude except for glow-in-the-dark body paint, and in another, she was nude except for a "3-6 foot gummy snake," according to court records.

The mother is now serving a 32-year sentence for her role in the scheme. Her conviction is under appeal.

Mr. Durtschi said he had "extreme regret, remorse and sorrow" about involving the girl and her mother.

Other men have expressed no such remorse, instead treating the girls like trading cards and bragging about their access to them, The Times found by monitoring Telegram channels and other communications.

The Florida Teen Models man described his many purchases of girls' worn leotards as "the ultimate collection." He encouraged the mother who recorded him to sell her daughter's clothing, too. "It can be tasteful, it can be tactful, and it also serves the public."

# 'They Could Live in Your House'

Three years after Mr. Hofmann and his wife separated, the well-known social media photographer began communicating on Facebook, Instagram and Snapchat with a 9-year-old girl named Avaree Harris, who was attending a dance school in Arizona, she recalled in an interview.

At the time, Ms. Harris said, getting attention online from Mr. Hofmann "was very exciting." She hoped that her friends would be impressed, and that she would draw more followers.

Later, Mr. Hofmann developed a romantic relationship with the girl's mother, and they moved to live with him in California.

Now 20, Ms. Harris said Mr. Hofmann's behavior sometimes made her uncomfortable. She said that he touched her leg and stomach in ways that confused her, that he insisted they sleep in the same hotel bed on a road trip and that, another time, he left a "wet spot" in the bed they were sharing.

Her recollections — which she previously shared with her mother — echoed, at least in part, the allegations filed in children's court on behalf of Mr. Hofmann's daughter, Maya.

In an interview, Ms. Hofmann, 21, provided additional details about the report. She said her father repeatedly came into her bed when she was 7 and did things she did not understand. She recalled once going into the bathroom and crying while telling her mother, "Dad is doing something gross."

The children's court sustained the allegation, documents show, after an investigation by family services in Los Angeles County — a significant result in the system, which is different from criminal court. Mr. Hofmann lost custody of his children and agreed to attend sex offender counseling, according to records of his divorce from Ms. Hofmann's mother, but he was never charged.

"There's a system that's supposed to keep us safe in this country," Ms. Hofmann said. "And that big system let me down and let him get away."

In an interview, Mr. Hofmann described himself as a normal parent, sometimes watching movies in bed with his children, and denied both girls' accounts in their entirety. He also pointed to a medical exam, not included in the documents reviewed by The Times but cited in his divorce filings, that found no physical signs of sexual abuse involving his daughter — something she has not alleged.

He said his ex-girlfriend later learned about the allegations and, after they broke up, "tried very publicly and aggressively to ruin my reputation."

He also cast blame on his former wife, who eventually lost custody of their children after experiencing mental health issues. For a while, the children were placed in foster care, and she moved back to her native Germany. Mr. Hofmann suggested the accusations involving his daughter were a result of his ex-wife's illness.

He shared family services documents detailing her psychological problems, including thoughts that her children were in danger of being molested by a fictitious person and her neighbors. But those documents indicated her delusions began in 2016, years after they separated and after the alleged abuse occurred. Both Maya Hofmann and her older brother, Aaron, confirmed that timeline.

At The Times's request, Aaron contacted his mother in Germany. In a text exchange, she said that she still thought her former husband was a pedophile but declined to comment further, saying she had moved on.

Multiple parents who hired Mr. Hofmann for photo shoots said that despite hearing rumors about him, they considered him kind and professional. The Times found no other abuse accusations against him. Over the weekend, his Instagram account was no longer online.

His popularity, Ms. Harris said, had made her reluctant to speak out, but she wanted people to know that predators can be disarming.

"They could have a big following," she said. "They could live in your house."

## Haunted, 'to This Day'

Three women told The Times of alleged sexual misconduct by Mr. Lidestri, the man who ran multiple websites, going back to the 2010s, when he paid them to be teen models for his websites, which he has since shut down.

Now in their mid-20s, the women said Mr. Lidestri took advantage of their unstable family situations or need for money to persuade them to appear nude in photos. One said he sexually assaulted her.

Ms. Compton, 26, started modeling for Mr. Lidestri when she was around 14. In her first session, she said, he told her to remove her top and use her hands to cover her breasts.

In a photo from one of his sites, she appeared in a see-through bra, pulling a mesh bikini bottom in a way that revealed her pubic area. She said she was 16 at the time.

The Times asked the Canadian Center for Child Protection, which helps combat abuse material, to review that photo and several others she flagged as being taken underage. Analysts issued notices for the photos, and they have since been removed from the websites where they appeared.

Mr. Lidestri also paid Ms. Compton for explicit images and videos meant only for him, she said, and she shared text messages detailing their communications when she was 17, as well as banking records.

Over a six-week period, he asked about a dozen times for graphic videos even after she said she wanted to stop. He mailed her the sex toy and said he would pay her every month if she sent him explicit content.

"You don't want to make a few hundred dollars?" he asked in one of the messages. "What are your alternatives?"

Ms. Compton declined, and when she later asked to be paid early for her regular modeling work because of a personal crisis, he demurred, saying he was in a "cash crunch" and couldn't do personal favors because she had refused to sell him private images.

"Can you compromise anywhere on giving me something so I can help you?" Mr. Lidestri asked. The messages indicate that she sent him a five-minute video for $100, which she described to the Times as showing masturbation.

Audrey Burns said she was sexually assaulted as a minor after she traveled for a photo shoot. Desiree Rios for The New York Times

Another woman, Audrey Burns, now 28, said Mr. Lidestri sexually assaulted her when she visited him in New York for a photo shoot. At the time, she said, her life was chaotic, and she had lived for a while with her mother in a shelter in Oklahoma.

She started working for Mr. Lidestri when she was 14, she recalled, and later traveled to New York with her mother. Photos she shared on Facebook from the trip included separate images of Mr. Lidestri and at least 10 $100 bills. They were posted in April 2013, when she was 16.

Mr. Lidestri offered her money beyond what she had been paid for the photo shoot, Ms. Burns said. He then sexually assaulted her with his hands and mouth, she said. "He asked if I wanted to stop, and I couldn't speak," she said. "I was catatonic."

Another woman, Amanda Zimmerman, 27, said she started modeling for Mr. Lidestri at 16. When she wanted to get a tattoo, she recalled, she needed his permission. As compensation, she said, he required a naked photo session. It "still haunts me to this day," she said. Ms. Zimmerman said Ms. Burns was also present at the shoot, and she corroborated the woman's account.

Amanda Zimmerman, who worked as a teen model, said
she was disturbed by a naked photo shoot that was
demanded of her. Kholood Eid for The New York Times

After speaking briefly with The Times, Mr. Lidestri referred questions to the
lawyer, Mr. Brill, who said his client was "concerned about the motivation behind
the allegations" because his business ties with at least two of the women
"collapsed due to contract breaches."

"As these allegations occurred more than a decade ago, these women may be
remembering some events that happened when they were adults, but they could
never have happened with Mr. Lidestri when they were underage," Mr. Brill said.
"Nevertheless, this was a business, and sometimes feelings may have gotten
hurt during business negotiations."

In particular, Mr. Brill disputed Ms. Burns's allegation of assault, saying it was "wholly and completely implausible" that her mother had left her alone and that a crime like what was alleged could have gone unreported.

All three women said they remained quiet when younger because they felt powerless, because they needed the money or because Mr. Lidestri said they or their parents could get in trouble.

But over the years, they discussed their experiences with family members or close friends. The Times spoke with Ms. Compton's partner and sister, who confirmed she had told them about her allegations long ago. Ms. Burns said she had come to grips with the events only in recent years, after hitting "rock bottom" and turning to a local church for help. Several months before The Times reached out, she confided in a close friend and her pastor about the alleged assault, the men confirmed.

As adults, the three women went into online sex work, saying the "built-in fan base" from Mr. Lidestri's sites had both pushed them and made the transition seem like the next logical step.

"I have no idea what my life would be like if I had never done this," Ms. Compton said. "But I know this is a direct cause of some of the most severe mental health issues I've ever had in my life."

*To report online child sexual abuse or find resources for those in need of help, contact the National Center for Missing and Exploited Children at 1-800-843-5678.*

Adam Liptak contributed reporting. Julie Tate contributed research. Produced by Gray Beltran and Rumsey Taylor.

**Jennifer Valentino-DeVries** is an investigative reporter at The Times who often uses data analysis to explore complex subjects. More about Jennifer Valentino-DeVries

**Michael H. Keller** is a Times reporter who combines traditional reporting and computer programming. His work has examined technology's impact on society and shortcomings of the criminal justice system. More about Michael H. Keller

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Inside the Instagram Network That Grooms Child Influencers