UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUDREY BURNS<br><br>        Plaintiff / Counterclaim-Defendant,<br><br>vs.<br><br>JAMES LIDESTRI,<br><br>        Defendant / Counterclaimant. | Case No. 7:25-cv-07474-KMK-JCM<br><br>**JOINT LETTER PURSUANT TO ECF NO. 43 ORDER** |

Dear Judge McCarthy:

The parties hereby submit this joint letter pursuant to the Court's July 24, 2026 Order (ECF No. 43).

**<u>Defendant's Position</u>**

The parties conferred on July 31 regarding Plaintiff's five stayed third-party subpoenas. Plaintiff refused to agree to any meaningful limitation of the sweeping subpoenas that the Court itself has found "appear problematic on their face." (ECF No. 43.) Defendant maintains the target-specific limits requested in his July 24 letter-motion (ECF No. 42): the subpoenas should be quashed or modified to the account-, card-, party-, domain-, and time-specific limits Defendant proposed, with all permitted production made simultaneously to both parties and treated as Confidential under the Protective Order (Dkt. 31).

Plaintiff declined those limits and offered two justifications for the subpoenas' breadth – that records should run "until the domain registrations expired," and that Plaintiff seeks Defendant's banking records to support a "disgorgement" of revenues attributed to Plaintiff's images. Neither rationale supports demands extending from 2009 to the present for every personal and business account, transaction, communication, linked account, domain, user, and item of traffic data. Rule 26(b)(1) requires a concrete claim nexus and proportionality. *See Ekstein v. Polito Assocs.*, No. 20-CV-1878 (JCM), 2022 WL 783000, at *3 (S.D.N.Y. Mar. 15, 2022).

1

**A.  The "Domain Registration Expiry" Theory Does Not Support the Temporal Scope**

Plaintiff proposes that financial records run until the relevant domain registrations lapsed – into 2023 and 2024. But a domain registration is a renewal fee, not a business. Registration, renewal, operation, and expiration are distinct events, as Defendant's verified interrogatory response already explained: domains in the GoDaddy account were canceled or allowed to expire after operations ceased. (Def. Supp. Resp. to Interrog. No. 4.) A registry term – which may be prepaid and are typically renewed for terms of ten years at a time – establishes neither an operating website nor a sale nor a dollar of revenue to Defendant, and its expiration date least of all: a domain that "expires" in 2023 or 2024 may simply reflect a multi-year term purchased years earlier, whether or not any website is operational. An expiration date therefore says nothing about what, if anything, was operating, published, or sold as of that date, and Plaintiff points to nothing that was. What matters is not when registrations lapsed but whether there was any sale or revenue connected to Plaintiff: her paid modeling for the websites ended in 2015, and Plaintiff has identified no sale of, or revenue to herself or to Defendant or BFC from, any image of her after that time. Defendant's produced records show BFC's payments to Plaintiff – $9,505 in 2013, $16,200 in 2014, and $3,000 in 2015 – and none thereafter. (JL000530.) Plaintiff, for her part, has produced no payment records at all: no bank statements, no tax returns, and no other document showing when, from whom, or how much she was paid for her content. The only payment records in this case are the ones Defendant produced – and they end in 2015.

Plaintiff's Internet Archive captures confirm cessation; they do not contradict it. Exhibit 2 – a January 2020 capture of a teenstarlet.com models-index page – is stamped "THIS IS AN ARCHIVE SITE," warns that "[t]here will be no further updates" and that "[s]ome sets from the past have been removed," and lists dozens of models' first names, "Kris" among them. Exhibit 1 – an April 2021 capture – announces that teenstarlet.com "Is No Longer Active." And the 2022 teenstarletgallery.com capture Plaintiff cites elsewhere shows a welcome blurb naming legacy catalogs, no set of Plaintiff among its visible releases – a site Defendant's verified response states was operated, upon information and belief, by a third party. (Def. Supp. Resp. to Interrog. No. 4.) A stage name on a description, advertisement, thumbnail, or frozen index page is not a sale: no capture shows a set of Plaintiff offered for sale, a price, a purchase, or a dollar of revenue, and Plaintiff identifies no sale of any image of her – from these sites or any site – and no revenue to Defendant or BFC from any such image.

Defendant's proposal already accommodates any exception for a transaction involving Plaintiff: if Plaintiff identifies a specific transaction that she contends involved her images – a particular sale, payment, or transfer – she may seek the records of that transaction, on that showing. What she may not do is demand every record of every account for a decade in the hope of finding one. *See Lively v. Wayfarer Studios* LLC, No. 24-cv-10049 (LJL), 2025 WL 662896 (S.D.N.Y. Feb. 28, 2025) (quashing non-party records subpoenas as "overly intrusive and disproportionate to the needs of the case" where they reached back years before the events alleged; "the hope that discovery will turn up information . . . does not justify the broad scope of the Subpoenas").

Nor did Defendant "hand-pick" the three domains. Plaintiff's complaint accurately listed the domains on which Plaintiff's content appeared: TeenStarlet.com, KrisKarson.com, and Honey-Cream.com. (FAC ¶¶ 107, 148–63.) A subpoena about Plaintiff's claims is bounded by Plaintiff's pleading; it is not enlarged by faulting Defendant for declining to catalogue every domain in a registrar account, most of which concern other models with no connection to this case.

## B.  The New "Disgorgement" Theory Cannot Justify the Banking Subpoenas

At the July 31 meet and confer, "disgorgement" was Plaintiff's principal justification for the banking subpoenas: Plaintiff stated that she seeks Defendant's banking records to quantify and disgorge the revenues attributable to her images. To the extent the theory has been abandoned, the banking subpoenas lose their stated purpose. To the extent it survives in softened form – as "the recovery of profits Defendant earned," and a demand for "credit information" said to bear on "Defendant and his company's financial state and structure" – it fails at every level.

*First*, disgorgement is not a remedy in this case. The FAC pleads no disgorgement, restitution, or unjust-enrichment claim; its prayer seeks compensatory or liquidated damages, punitive damages, interest, and fees – not Defendant's profits. Nor do the statutes Plaintiff invokes provide such a remedy: Section 2255 provides for the plaintiff's actual damages or liquidated damages, costs and fees, discretionary punitive damages, and "preliminary and equitable relief" – nothing more. 18 U.S.C. § 2255(a); *see Singleton v. Clash*, 951 F. Supp. 2d 578, 584 (S.D.N.Y. 2013), aff'd, 558 F. App'x 44 (2d Cir. 2014). No court has held that disgorgement of a defendant's profits is available under § 2255, and the Second Circuit has

described disgorgement as "a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011), abrogated on other grounds by *AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67 (2021); *accord SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) (disgorgement serves enforcement, not compensation). And if Plaintiff now asserts a new category of monetary relief, Rule 26(a)(1)(A)(iii) required a computation of it and the materials supporting it; none has ever been served. A subpoena cannot manufacture a remedy the complaint does not contain.

*Second*, even if a profits-based equitable remedy were available, it could not be measured this way. Equity limits any such recovery to net profits causally attributable to the alleged wrong, after legitimate expenses – not gross deposits across every account and venture for a decade. *Liu v. SEC*, 591 U.S. 71, 79–80 (2020). The subpoenas demand every statement, transaction, signatory, loan, and linked account since 2009; those materials are not a measure of Plaintiff-specific net profit under any theory. The subpoenaed records are therefore structurally incapable of showing "how much money was made from Plaintiff's images" – the one thing they are offered to show. Fed. R. Civ. P. 26(b)(1); *cf. Lively*, 2025 WL 662896 (quashing where the issuing party "identified no means to segregate" records with some relevance from records that "would have no relevance and would reveal sensitive personal information"). Plaintiff's newest theory – that bank and transfer records will identify "subscribers and counterparties who may hold copies" of her images – is the same defect inverted: a deposit does not disclose what was purchased, and canvassing everyone who ever paid Defendant in the hope of locating copies is exactly the expedition *Lively* forecloses.

*Third*, the less intrusive source has already been produced. The Court-ordered tax returns (JL000427–530) state BFC's gross receipts for 2013 through 2015 – the years in which Plaintiff modeled and was paid. What the banking subpoenas add is not revenue information but a transaction-by-transaction inventory of Defendant's financial life across a decade – precisely the privacy interest that gives Defendant standing and that the Court's stay protects. *Arias-Zeballos v. Tan*, No. 06 Civ. 1268 (GEL)(KNF), 2007 WL 210112, at *1 (S.D.N.Y. Jan. 25, 2007); *Silverstone Holding Grp., LLC v. Zhongtie Dacheng (Zhuhai) Inv. Mgmt. Co.*, 650 F. Supp. 3d 199, 202–03 (S.D.N.Y. 2023); *accord Merida Capital Partners III LP v. Fernane*, No. 25-cv-1235 (JAV), 2025 WL 1541072, at *5 (S.D.N.Y. May 30, 2025); *Lively*, 2025 WL 662896 (bank records are "the paradigmatic example of information for which a privacy interest confers

standing to object to a subpoena"); *cf. Flybar Inc. v. Express Trade Capital, Inc.,* No. 25 CIV. 618 (VSB) (GS), 2026 WL 1453579, at *3  (S.D.N.Y. May 22, 2026) (confining bank subpoena to one identified account, named counterparties, and a four-month period, with confidential treatment).

## C.  The Modifications Defendant Proposes

- **Wells Fargo:** the identified BFC Enterprises, LLC business checking account, January 1, 2011 – December 31, 2015; no personal accounts, unrelated venture accounts, or credit information; specific-transaction showing available as set forth above.

- **American Express:** accounts ending 2005 and 1007 only, January 1, 2011 – December 31, 2015; withdraw accounts ending 1674 and 1008; no credit information or account communications.

- **Western Union:** limited to transfers in which Audrey Burns or Wynona Burns is the named sender or recipient.

- **Akamai:** Schedule A limited to TeenStarlet.com, KrisKarson.com, and Honey-Cream.com during each site's operating period, and to records identifying the account holder, hosting relationship, and period of operation – the categories that could bear on Plaintiff's claims – excluding traffic logs, source-IP data, and visitor information, which implicate non-parties and no issue in this case.

- **Morganelli:** limited to records concerning TeenStarlet.com, KrisKarson.com, and Honey-Cream.com, or specifically identifying Plaintiff or a known alias of Plaintiff, during the period the identified sites actually operated.

- **All subpoenas:** complete, properly executed AO 88B forms; service and compliance information; simultaneous production to both parties; presumptive Confidential treatment under Dkt. 31.

Defendant respectfully requests that the stay remain in effect except as to corrected subpoenas embodying the limits above.

## Plaintiff's Position

Defendant moves to quash or rewrite five third-party subpoenas that seek plainly relevant information Defendant himself says he cannot provide. His motion fails at the threshold and on

the merits. As the party seeking to quash or modify, Defendant bears the burden of establishing that each subpoena is improper. Rule 45 requires the Court to quash or modify only a subpoena that "subjects a person to undue burden," and the operative question under Rule 26(b)(1) is whether the information sought is nonprivileged, relevant to a claim or defense, and proportional to the needs of the case. See *Leslie v Starbucks Corp.*, 2024 U.S. App. LEXIS 11735, at \*16 [2d Cir May 15, 2024, No. 23-1194-cv]. Measured against that standard, the subpoenas should be enforced and the stay lifted.

**A. The Temporal Cutoff Should Track When Each Website Ceased to Exist, Not Defendant's Proposed 2015 Date.**

Defendant asks the Court to cut off every subpoena at December 31, 2015 because "her paid modeling for the websites ended in 2015." That date is not tied to any record fact; it is tied to Defendant's say-so. Defendant has not sworn to when he stopped selling Plaintiff's images, and publicly available information affirmatively contradicts a 2015 cutoff (See Exhibit 1, Exhibit 2). Exhibit 1 shows that, on April 18, 2021, Defendant's TeenStarlet.com website was directing individuals to his TeenStarletGallery.com website. Exhibit 2 shows that on January 20, 2020, Defendant was still selling images of "Kris" – along with dozens of other models – to members behind a paywall. Defendant's offering of a 2015 cutoff is arbitrary. The KrisKarson.com registration ran to an April 2024 expiration; TeenStarlet.com ran to a 2023 expiration; and Defendant registered entirely new content sites well after 2015, including teenstarletgallery.com in 2019.

Because Plaintiff's claims reach Defendant's continued sale, distribution, and receipt of profits from her images and Plaintiff's ongoing harm from his hosting of the content, the relevant period does not end when Defendant unilaterally says it does. Plaintiff proposes that each subpoena's end date be set to the date the corresponding website or domain ceased to exist or was no longer registered in Defendant's name or that of BFC Enterprises, LLC, as reflected in the GoDaddy records. That is an objective, record-anchored cutoff, and Plaintiff has offered it in the spirit of proportionality under Rule 26(b)(1).

**B. It Is Improper to Confine the Subpoenas to the Sites Defendant Has Selected, Because Defendant Has Never Identified the Full Universe of Sites Carrying Plaintiff's Images.**

Defendant's proposed modifications would limit the Akamai and Morganelli subpoenas to a handful of domains he has hand-picked and would limit the financial subpoenas to accounts he has designated. Defendant has never, in any interrogatory response, affidavit, or other document, identified all of the websites on which he hosted, sold, or distributed Plaintiff's images. Having withheld that information, Defendant cannot now insist that discovery be confined to the sites he chooses to acknowledge. A limitation drawn by the party who controls, and has concealed, the relevant list is not a proportionality limitation; it is a mechanism to define the dispute in his own favor.

The subpoenas' reach to linked domains and accounts is properly calibrated to this problem. The GoDaddy records show that dozens of model-name and content domains, including sites bearing the stage names of Defendant's other models, were registered under a single Shopper ID (12666874) alongside TeenStarlet.com, SelectSets.com, KrisKarson.com, and the other sites at issue. Identifying the domains, hosting, and accounts linked to that same shopper account, payment method, and infrastructure is the only reliable way to determine where Plaintiff's images actually appeared, precisely because Defendant has declined to answer that very question.  Finally, Defendant's claim that visitor information would implicate non-parties and is not at issue in this case is unpersuasive.  Each visitor is a potential witness and also goes to the enormity of the harm caused by Defendant.

### C. The Third-Party Records Are Necessary to Locate the Original Files and to Trace the Revenue at Issue.

Defendant has produced nothing that identifies the original image and video files, and he disputes that he still possesses them.  Moreso, he continues to take issue with Plaintiff's production of images/videos she has obtained online and denies all knowledge as to their authenticity or where they were filmed.  Plaintiff is therefore left to locate the originals through the third parties who hosted, processed, or received them for Defendant.  The Akamai and Morganelli subpoenas seek the hosting, origin-server, content, and takedown records that would identify where the original files reside and who received them; the Western Union, Wells Fargo, and American Express subpoenas seek the payment and transfer records that would identify both the subscribers and counterparties who may hold copies and the revenue Defendant derived from selling Plaintiff's content. This information is relevant to Plaintiff's claims and to the relief she

seeks, including the recovery of profits Defendant earned from the sale of her images. Plaintiff does not seek records of money Defendant paid out generally; she seeks the records necessary to trace where her images went and what Defendant received for them.  Plaintiff has no interest in sorting through irrelevant financial information however, at this juncture, and given the stonewalling that has occurred to date, she cannot simply rely on Defendant's self-serving limitation to specific accounts – especially since the accounts Defendant seeks to omit were received as part of this litigation and thus presumably used during this time period for a relevant purpose.  Further, Plaintiff declines to withdraw the portions of her requests seeking credit information or account communications as both are relevant to her understanding and identification of Defendant and his company's financial state and structure.

### D.  Defendant's Western Union Limitations Are Overly Narrow.

Defendant proposes limiting his Western Union transfers to transactions in which Audrey Burns or Wynona Burns was the named sender or recipient.  As Plaintiff was not residing with her mother for the entirety of the time she was being paid by Defendant, this limitation is excessive and will likely result in a plethora of missed payments as it appears that Western Union payments cannot be received by individuals under the age of eighteen.  Further, narrowing the subpoena to only these two recipients will result in the omission of other relevant information, including the names and payment information for photographers, make-up artists, and other vendors.

### E.  Plaintiff Objects to Presumptive Confidential Treatment.

It is premature for Defendant's counsel to call for the wholesale classification of any production received pursuant to these subpoenas as confidential pursuant to the parties' confidentiality agreement.   Pursuant to that agreement, counsel must determine, "in good faith, that such designation is necessary to protect the interests of the client in information that is proprietary, a trade secret, or otherwise sensitive non-public information."  A presumptive designation flips the burden of assessing confidentiality onto Plaintiff and would sweep in records that carry no cognizable confidentiality interest at all, such as third-party domain, hosting, and registrar records held by Akamai and Morganelli.  Should Defendant seek to make a certain document confidential, he may do so under the protective order, which permits him to

seek a Confidential designation upon showing of good faith determination that designation is necessary.

### F.  Plaintiff's Good-Faith Narrowing and Requested Relief.

To narrow the disputes, Plaintiff agrees that: (a) each subpoena's end date will be tied to the date the corresponding site or domain ceased to exist or was deregistered, as reflected in the GoDaddy records, rather than run open-endedly "to the present"; (b) Plaintiff will redact sensitive information received, including account numbers and financial information relating to other models; and (c) any production will be made simultaneously to both sides. Plaintiff will also provide complete, properly executed copies of each subpoena with service and compliance information to the extent any served form was defective.

### G.  Plaintiff's Additional Responses

**August 3, 2026**

The information sought in the subpoenas is information which should have been produced as part of discovery but was not – apparently due to the theft of Defendant's documents.  Plaintiff does not "concede" this fact but rather, as the Court has acknowledged, realizes there is nothing she or this Court can do to force Defendant to produce information he claims not to have.  Instead, she is limited to subpoenas.   Plaintiff's exhibits demonstrate that Defendant's own websites were advertising the sale of Plaintiff's content well after the alleged theft.  Defendant's claim that Plaintiff cannot prove which images he was selling behind the paywall, how much he was selling them for, or if anyone was buying them is information which should have been turned over through discovery but was not.  Finally, as to Defendant's reference to JL000530, Plaintiff has attached it as Exhibit 4.  It is a one-page 1099 Summary table purporting to show payments made to Audrey Burns by BFC Enterprises, LLC. It cites to and includes zero source documents.

**August 4, 2026**

Plaintiff declines to provide a substantive response to Defendant's most recent additions to avoid further delaying the already untimely filing.  Plaintiff's inability to produce payment records should come as no surprise, as she was approximately fifteen years old, housing insecure, unfamiliar with taxes, does not recall receiving a 1099, and did not have a bank account

9

when Defendant began paying for her content.  Conversely, Defendant was an approximately fifty-year-old business owner with decades of experience in life and technology.

### H.  Conclusion

Plaintiff respectfully requests that the Court lift the stay and permit the subpoenas to proceed as narrowed above, rather than confine them to the sites and accounts Defendant has selected while he continues to withhold the information needed to identify the full scope of his conduct. We thank the Court for its attention to this matter.

Respectfully submitted,

| | |
|---|---|
| **LEWIS & LIN LLC** | **VERIDIAN LEGAL P.C.** |
| By: */s/ Michael D. Cilento* | By: */s/ Cali P. Madia* |
| Michael D. Cilento, Esq. | Cali P. Madia, Esq. |
| David D. Lin, Esq. | Daniel S. Szalkiewicz, Esq. |
| 77 Sands Street, 6th Floor | 23 West 73rd Street, Suite 102 |
| Brooklyn, New York 11201 | New York, New York 10023 |
| Telephone: (718) 243-9325 | Telephone: (212) 706-1007 |
| Michael@iLawco.com | daniel@veridianlegal.com |
| David@iLawco.com | cali@veridianlegal.com |
| Attorneys for Defendant/Counterclaimant | Attorneys for Plaintiff/Counterclaim-Defendant |